1  RON BENDER (SBN 143364)
   PHILIP A. GASTEIER (SBN 130043)
2  IRV M. GROSS (SBN 53659)
   KRIKOR J. MESHEFEJIAN (SBN 255030)
3  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
   Telephone:  (310) 229-1234
5  Facsimile:  (310) 229-1244
6  Email: rb@lnbyb.com; pag@lnbyb.com; img@lnbyb.com; kjm@lnbyb.com

7  Attorneys for Plaintiff Rdio, Inc.

8

9              **UNITED STATES BANKRUPTCY COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
10               **SAN FRANCISCO DIVISION**

11  In re:                                    ) Case No. 15-31430
                                              )
12  RDIO, INC.,                               ) Chapter 11
                                              )
13          Debtor and Debtor in Possession.  ) Adv. Proceeding No. 16-03045
                                              )
14  _____  )
                                              )
15  RDIO, INC.,                               ) **PLAINTIFF RDIO, INC.'S MOTION FOR**
                                              ) **A TEMPORARY RESTRAINING ORDER**
16          Plaintiff,                        ) **AND A PRELIMINARY INJUNCTION**
                                              ) **PURSUANT TO 11 U.S.C. §§ 105 AND 362,**
17      v.                                    ) **RULE 65 OF THE FEDERAL RULES OF**
                                              ) **CIVIL PROCEDURE, AND RULES**
18  SONY MUSIC ENTERTAINMENT,                 ) **7001(7) AND 7065 OF THE FEDERAL**
                                              ) **RULES OF BANKRUPTCY**
19          Defendant.                        ) **PROCEDURE; MEMORANDUM OF**
                                              ) **POINTS AND AUTHORITIES IN**
20                                            ) **SUPPORT THEREOF**
                                              )
21                                            )
                                              )
22                                            )
                                              )
23  _____  )

24

25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................4

I.      PRELIMINARY STATEMENT .....................................................................4

II.     STATEMENT OF FACTS ...........................................................................6

        A.      Background Information ............................................................6

        B.      The Sale Of The Debtor's Assets ..............................................6

        C.      Sony's Proof Of Claim .............................................................9

        D.      Sony's New York Action ...........................................................9

        E.      The NY Action Will Distract Key Individuals Involved In The
                Debtor's Bankruptcy .............................................................10

        F.      Indemnification Claims of Mr. Bay, Mr. Peters, and Mr. Rondinelli.........11

        G.      The Debtor's Insurance Policies And Proceeds Of Those Policies .............12

III.    ARGUMENT ............................................................................................12

        A.      This Court Has Jurisdiction Over The Claims Asserted In The NY
                Action...........................................................................................12

        B.      The Court Should Issue A Temporary Restraining Order And
                Preliminary Injunction Prohibiting Sony From Continuing To
                Prosecute The NY Action Against The Non-Debtor Defendants
                Pending A Resolution Of Sony's Bankruptcy Claim .....................14

                1.      The Debtor Is Likely To Succeed On The Merits .............16

                        (a)     The Debtor Is The Actual Defendant In The NY
                                Complaint.............................................................17

                        (b)     The Bankruptcy Claim Will Be Administered In This
                                Case Pursuant To The Claim Administration And Plan
                                Confirmation Process...........................................20

                2.      The Debtor Is Likely To Suffer Irreparable Harm In The
                        Absence Of An Injunction ...................................................21

                        (a)     Continuation of the NY Action Would Result In a
                                Significant Risk of Res Judicata or Claim or Issue
                                Preclusion to the Debtor's Detriment.......................22

|  |  | (b) | Continuation of the NY Action Would Result in Indemnification Claims Which Would Further Jeopardize Property of the Debtor's Estate | 23 |

(b) Continuation of the NY Action Would Result in Indemnification Claims Which Would Further Jeopardize Property of the Debtor's Estate........................... 23

(c) Continuation of the NY Action Would Result in the Dissipation of Insurance Proceeds Which May Ultimately Belong to the Debtor's Estate ............................... 24

(d) Continuation of the NY Action Will Entail a Significant Distraction of Mssrs. Bay, Peters, and Rondinelli................. 25

3. The Balance Of Hardships Weighs Heavily In The Debtor's Favor.................................................................................................. 27

4. The Injunction Serves The Public Interest To The Extent Applicable .......................................................................................... 27

IV. CONCLUSION ................................................................................................ 28

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

*A.H. Robins Co., Inc. v. Piccinin*
788 F.2d 994 (4th Cir. 1986).................................................................. passim

*Adelphia Commc'ns Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.* (*In re Adelphia Commc'ns Corp.*)
302 B.R. 439 (Bankr. S.D.N.Y. 2003) ...............................................22

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011)..............................................................15

*Chase Manhattan Bank v. Third Eighty-Ninth Assocs. (In re Third Eighty-Ninth Assocs.)*
138 B.R. 144 (S.D.N.Y. 1992) ............................................................26

*Circle K Corp. v. Marks (In re Circle K Corp.)*
121 B.R. 257 (Bankr. D. Az. 1990)......................................................25

*Clear Channel Outdoor, Inc. v. City of Los Angeles*
340 F.2d 810 (9th Cir. 2003)...............................................................14

*Crum v. Blixeth (In re Big Springs Realty LLC)*
426 B.R. 860 (Bankr. D. Mont. 2010)..................................................16

*Feitz v. Great Western Savings (In re Feitz)*
852 F.2d 455 (9th Cir. 1988)...............................................................13

*Flynt Distributing Company, Inc. v. Harvey*
734 F.2d 1389 (9th Cir. 1984).............................................................16

*Homestead Holdings, Inc. v. Broome & Wellington (In re PTI Holding Corp.)*
346 B.R. 820 (Bankr. D. Nev. 2006)....................................................26

*In re Am. Film Tech, Inc.*
175 B.R. 847 (Bankr. D. Del. 1994) ...............................................21, 22

*In re Arana*
456 B.R. 161 (Bankr. E.D.N.Y. 2011) .................................................27

*In re Baldwin-United Corp.*
57 B.R. 759 (S.D. Ohio 1985)..............................................................25

*In re Calpine Corp.*
354 B.R. 45 (Bankr. S.D.N.Y. 2006) <u>aff'd</u>. 365 B.R. 401 (S.D.N.Y. 2007) ........................21

*In re Continental Airlines, Inc.*
177 B.R. 475 (D. Del. 1993) ...........................................................19, 23

*In re Family Health Servs., Inc.*
   105 B.R. 937 (Bankr. C.D. Cal. 1989) ...................................................19, 23

*In re Family Health Servs., Inc.*
   105 B.R. 942-43 ...................................................................................19

*In re Focus Media Inc.*
   387 F.3d 1077 (9th Cir.2004), *cert. den., Rubin v. Pringle*, 544 U.S. 923, 125 S.Ct.
   1674, 161 L.Ed.2d 482 (2004) ...........................................................16

*In re L.A. Dodgers LLC*
   465 B.R. 18 (Bankr. D. Del. 2011) ......................................................24

*In re Lazarus*
   161 B.R. 891...............................................................................27, 28

*In re Phila. Newspapers*
   407 B.R. 606 (E.D. Pa. 2009)........................................................13, 24

*In re Roberts*
   175 B.R. 339 (B.A.P. 9th Cir. 1994) ...................................................17

*In re Sudbury*
   140 B.R. 461 (Bankr. N.D. Ohio 1992) ...............................................21

*Jackson v. Fenway Partners, LLC*
   2013 2013 WL 1411223 (N.D. Cal. Apr. 8, 2013) ...............................13

*Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.)*
   26 B.R. 420 (Bankr. S.D.N.Y. 1983) ..............................................19, 24

*Litchfield Co. v. The Anchor Bank (In re Litchfield Co.)*
   135 B.R. 797, 807 (W.D.N.C. 1992) ...................................................28

*McCartney v. Integra Nat'l Bank N.*
   106 F.2d 506 (3d Cir. 1997)........................................................19, 24

*Pacor, Inc. v. Higgins*
   743 F.2d 984 (3d Cir. 1984) ..............................................................13

*Queenie, Ltd. v. Nygard Int'l*
   321 F.3d 282 (2d Cir. 2003)...............................................................23

*Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*
   502 F.3d 1086 (9th Cir. 2007)....................................................15, 17, 20

*Spiers Graff Spiers v. Menako (In re Spiers Graff Spiers)*
   190 B.R. 1001 (Bankr. N.D. Ill. 1996)..................................................28

iv

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*
  240 F.3d 832 (9th Cir.2001) ..................................................................14

*University of Texas v. Camenisch*
  451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ...........................15

*Winter v. Natural Resources Defense Council, Inc.*
  555 U.S. 7 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ........................14, 15

**OTHER CASES**

*Sony Music Entertainment v. Anthony Bay, Elliott Peters, and Jim Rondinelli*
  Case No. 1:16-cv-02505-RJS (the "<u>NY Action</u>") ...........................9

*Sony Music Entertainment v. Anthony Bay, Elliott Peters, and Jim Rondinelli*
  Case No. 1:16-cv-02505-RJS (the "<u>NY Action</u>"), pending .........2, 10, 12

**FEDERAL STATUTES**

11 U.S.C. § 105 ..............................................................................2, 15, 25, 28

11 U.S.C. § 105(a) ................................................................................15, 17, 27

11 U.S.C. § 362 ..............................................................................2, 16, 17, 28

11 U.S.C. § 362(a) ..........................................2, 4, 15, 16, 18, 19, 20, 27

11 U.S.C. § 363 ..........................................................................................7, 8

11 U.S.C. § 1107 ............................................................................................6

11 U.S.C. § 1108 ............................................................................................6

28 U.S.C. § 1334(b) ................................................................................12, 13

**FEDERAL RULES**

Fed.R.Bankr.P. 7065 ................................................................................2, 14

Fed.R.Civ.P. 65 ........................................................................................2, 14

**TO THE HONORABLE DENNIS J. MONTALI, UNITED STATES BANKRUPTCY JUDGE, AND TO DEFENDANT AND ITS ATTORNEYS OF RECORD:**

Plaintiff Rdio, Inc., debtor and debtor in possession in the above-referenced chapter 11 case (the "Debtor"), will and hereby does move (the "Motion") for (1) issuance of a temporary restraining order and preliminary injunction prohibiting defendant Sony Music Entertainment ("Sony") from continuing to prosecute any and all claims asserted by it in that certain action currently pending in the United States District Court for the Southern District of New York, styled *Sony Music Entertainment v. Anthony Bay, Elliott Peters, and Jim Rondinelli*, Case No. 1:16-cv-02505-RJS (the "NY Action"), pending liquidation of Sony's proof of claim in the Debtor's bankruptcy case, designated as Claim No. 54 (the "Sony Bankruptcy Claim" or "Bankruptcy Claim"), in this bankruptcy case, and (2) entry of an order in the Debtor's bankruptcy case extending the automatic stay under 11 U.S.C. §§ 105 and 362 to any and all claims asserted by Sony in the NY Action, pending liquidation of the Bankruptcy Claim.

As explained more fully below, the Motion is brought pursuant to Rule 65 of the Federal Rules of Civil Procedure made applicable herein by Rule 7065 of the Federal Rules of Bankruptcy Procedure, and 11 U.S.C. §§ 105 and 362(a), on the following grounds: First, the NY Action, ostensibly brought only against non-debtor individuals, Anthony Bay, the Debtor's Chief Executive Officer, Elliott Peters, the Debtor's General Counsel and Vice-President, and Jim Rondinelli, the Debtor's Head of Content and Catalog Acquisition and Senior Vice President, is in fact an action against the Debtor undertaken in a manner designed to evade the automatic stay, and therefore does and will continue to violate §362 if not enjoined. The Debtor is not a party to the NY Action, is not represented by counsel in that litigation, and thus cannot contest the allegations made by Sony in the NY Action, including the right to appeal any adverse ruling or judgment. Because the factual and legal issues in the NY Action are virtually identical to those in the Bankruptcy Claim, the Debtor is in imminent risk of irreparable harm in the event of rulings in the NY Action that adversely and preclusively affect its rights and defenses in and to the Bankruptcy Claim, unless Sony is enjoined from prosecuting the NY

2

Action until there has been a disposition of the Bankruptcy Claim. Second, these individual non-debtors are essential to the Debtor's effort to successfully steer through this bankruptcy case, and having to defend the NY Action will unfairly and unnecessarily impose a strain upon their time and resources that will significantly distract them from assisting the Debtor. Third, the interests of the Debtor, its estate *and* creditors will be jeopardized by the non-debtor defendants' indemnification claims that have been triggered by the NY Action, as well by the dissipation of insurance proceeds that might otherwise ultimately belong to the Debtor's estate. Fourth, the relative harm and equities in this case - indeed, there is no demonstrable harm to Sony in the event the NY Action is enjoined - weigh decidedly in favor of the Debtor and in support of providing injunctive relief.

In the context of this bankruptcy case, the Debtor has a reasonable likelihood of "success on the merits" both of confirming a plan of reorganization for the benefit of creditors and of establishing that the common claims asserted in the Bankruptcy Claim and in the NY Action should be determined by the Bankruptcy Court. The Debtor is likely to be successful in both efforts. Injunctive relief, therefore, is necessary and appropriate.

Finally, it is in the public interest to foster and enable the efficient and orderly administration of a debtor's bankruptcy estate. In this instance, that goal is best served by enjoining Sony from prosecuting the NY Action, and to require it to litigate its claims with the Debtor where and as they should be, through the claim resolution process and disposition of Sony's Bankruptcy Claim.

The Motion is based on the concurrently filed complaint, the following memorandum of points and authorities, the concurrently filed Declaration of Elliott Peters, and upon such further oral and documentary evidence as may be presented and received at the time of the hearing.

Dated: May 9, 2016                    LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

By:    */s/ Ron Bender*
       RON BENDER
       PHILIP A. GASTEIER
       IRV M. GROSS
       KRIKOR J. MESHEFEJIAN
       Attorneys for Plaintiff Rdio, Inc.

5

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

### I. PRELIMINARY STATEMENT

By filing a separate action against the Debtor's officers and employees, Sony is attempting to litigate its fraudulent inducement and unjust enrichment claims against the Debtor outside of the Bankruptcy Court. This Court's immediate intervention is necessary to prevent Sony's prosecution of the NY Action which: (1) violates the automatic stay provisions of 11 U.S.C. § 362(a); (2) invades the jurisdiction of this Court; and (3) impairs the rights and interests of the Debtor and its estate and will irreparably harm the Debtor and the Debtor's estate. Immediate relief is warranted because there is an upcoming response deadline of June 13, 2016 in the NY Action, and the ultimate effect of the NY Action, if allowed to proceed, would be to try Sony's Bankruptcy Claim against the Debtor, without obtaining relief from the automatic stay, without the Debtor's involvement, without legal representation for the Debtor in the NY Action, and outside of the jurisdiction of this Court. Any factual or legal findings against the token non-debtor defendants named in the NY Action may be binding against the Debtor. This would severely prejudice the Debtor's estate, especially given that the Debtor is not a party to the NY Action.

The Motion should be granted for three reasons. ***First***, the claims brought in the NY Action by Sony are identical to the claims already brought by Sony against the Debtor in its Bankruptcy Claim, and the proper venue for adjudication of those claims is the Bankruptcy Court. In an attempt to evade the automatic stay, Sony brought claims for fraudulent inducement and unjust enrichment solely against three executives of the Debtor in the NY Action that it already has asserted against the Debtor in the Bankruptcy Court. The Court need only compare the allegations set forth in the NY Complaint with the allegations set forth in Sony's Bankruptcy Claim to discern that the NY Action is nothing more than a transparent effort to circumvent the automatic stay and this Court's jurisdiction. ***The allegations in the NY***

---

[1] Unless otherwise stated, all defined terms shall have the meanings ascribed to them in the underlying Complaint and the preceding Motion.

*Action and the Bankruptcy Claim are virtually identical*, save for stylistic and grammatical changes. Indeed, Sony's fraud and unjust enrichment claims in the NY Action are based on allegations that Sony has made *directly against the Debtor* in its Bankruptcy Claim. No one disputes, of course, that Sony's Bankruptcy Claim against the Debtor is subject to the jurisdiction of this Court, and is subject to the claim administration and plan confirmation process which the Debtor has already initiated in this case. Yet any factual or legal findings against the non-debtor defendants in the NY Action may be binding against the Debtor under the doctrines of issue or claim preclusion or some other rule of law or equity that may have a preclusive effect, including in connection with the Sony Bankruptcy Claim. Sony should not be permitted to make an end-run around this process by leveling the exact same claims against certain employees of the Debtor in another Court.

*Second*, allowing the NY Action to continue will diminish the assets of the bankruptcy estate. All of the non-debtor defendants in the NY Action have indemnification claims against the Debtor arising from the NY Action. Those claims will increase the amount of claims against the Debtor's bankruptcy estate, thereby potentially reducing recoveries in this case to other creditors. This exposure effectively makes the Debtor the actual defendant in the NY Action.

The Debtor also has liability insurance coverage extending to claims against it and its executives and/or employees asserting, among other things, breach of duty, neglect, error, misstatement, misleading statement, omission or act of the Debtor or of such executives or employees. The insurance policies constitute property of the Debtor's bankruptcy estate. Proceeds from those insurance policies may also be an asset of the Debtor's bankruptcy estate. The claims asserted in the NY Complaint and in the Bankruptcy Claim have been tendered to the insurance carrier. The policy is a "wasting" policy, such that defense costs reduce the amount of insurance proceeds available under the policies. As such, if the NY Action is not stayed, defense costs related to that action will reduce proceeds of the Debtor's directors' and officers' liability insurance policies, thereby further diminishing what may be assets available for creditors.

**Third**, the prosecution of the NY Action against the Debtor's executives will severely impair their ability to assist the Debtor with the administration of the Debtor's estate. The NY Action was filed against the Debtor's Chief Executive Officer Anthony Bay, the Debtor's General Counsel and Senior Vice President Elliott Peters, and the Debtor's Head of Content and Catalog Acquisition and Senior Vice President Jim Rondinelli, all of whom have been intimately involved in administration of the Debtor's bankruptcy estate. Being forced to defend themselves against allegations of fraud in the NY Action while the bankruptcy is ongoing will divert the attention of Mr. Bay, Mr. Peters, and Mr. Rondinelli from the administration of the Debtor's bankruptcy estate. Given these facts, this Court should grant the Motion to protect and preserve the Debtor's estate and this Court's jurisdiction over the estate's assets, and also to ensure the orderly determination of claims against the Debtor and the reorganization process by the Bankruptcy Court.

## II.  STATEMENT OF FACTS

### A.  Background Information.

The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date"). Substantially all of the Debtor's business assets were sold to Pandora Media, Inc. ("Pandora") in a sale which was approved by Order entered on December 22, 2015 and closed on December 23, 2015. The Debtor continues to manage its financial affairs and administer its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtor was founded in 2008 as a digital music service provider. The Debtor's business operations were launched in 2010 after it had secured requisite licenses from the applicable holders of music rights.

### B.  The Sale Of The Debtor's Assets.

Despite the investment of several hundred million dollars and years of effort to build its subscriber base (and to attract meaningful advertising dollars), the Debtor was unable to achieve profitability – or even to reduce its operating losses to tolerable levels.

As a result, in the fall of 2014, Pulser Media, Inc. ("Pulser"), the Debtor's majority shareholder, employed a highly qualified investment bank, Moelis & Company ("Moelis"). The initial goal was to raise new equity capital. Despite extensive efforts by Moelis, however, the prospects for raising new debt or equity capital were not promising at the time. At that point, Pulser extended the Moelis mandate to include seeking a buyer or merger partner because the Debtor was not going to be able to continue to fund its significant operating losses indefinitely. As part of its efforts to raise additional capital, Moelis and the Debtor held introductory telephone calls with potential interested parties to walk through the opportunity and initiated contact with 110 potential buyers or investors based throughout the world. The Debtor and Moelis eventually executed non-disclosure agreements with 32 interested parties and provided the Debtor's management marketing materials to all of them. This produced in-person meetings or calls between the Debtor's management team and 16 interested parties.

By June 2015, Pandora was emerging as the most interested party and the party most likely to present the best offer and to close a sale. On July 8, 2015, Pandora submitted a signed preliminary letter of intent (the "Initial LOI"), which was never countersigned by the Debtor. Concurrent with the continuing negotiations with Pandora regarding the Initial LOI, Moelis continued its marketing efforts, and, over the subsequent three months, the Debtor's management and Moelis continued discussions with other interested parties that had been identified.

After vigorous negotiation of the Initial LOI and several subsequent versions, and additional due diligence by Pandora, the parties executed a non-binding LOI on September 29, 2015 (the "Executed Non-Binding LOI"). Following the execution of the Executed Non-Binding LOI, Pandora continued its due diligence and the parties commenced negotiations on the terms of a potential definitive transaction. Those negotiations were also very intense and extended, and Pandora continued its due diligence throughout the negotiations. The Executed Non-Binding LOI provided that, upon the election of Pandora, the Debtor's asset sale to Pandora would be conducted as part of a Chapter 11 bankruptcy process and an asset purchase pursuant to a sale under 11 U.S.C. § 363. After the Executed Non-Binding LOI, the Debtor and Pandora

held several discussions regarding potential alternatives to a Chapter 11 bankruptcy process and the Debtor pursued financing transactions with other parties. Negotiations between the Debtor and Pandora continued until the definitive Asset Purchase Agreement between the Debtor and Pandora was executed on November 16, 2015 (the "APA"). Pursuant to the APA, Pandora required that its asset purchase be consummated through a chapter 11 bankruptcy process by the Debtor and an asset sale under 11 U.S.C. § 363. On the same day the APA was executed (the Petition Date), the Debtor filed for bankruptcy protection.

Throughout the entire negotiation between the Debtor and Pandora and until shortly before the parties executed the APA it was anticipated that Pandora would acquire the Debtor's assets in a manner that would allow Pandora to continue to operate the Debtor's business as a going concern. Ultimately, Pandora decided that it would not purchase the Debtor's business as a going concern, but would acquire only certain assets, consisting primarily of the Debtor's core technology and related engineering and product/design staff.

As part of the Debtor's proposed sale of substantially all of its assets to Pandora, Pandora agreed that the Debtor could and should market Pandora's offer for overbid to ensure that the highest and best price was paid for the Debtor's assets. As part of the bidding process, the Debtor served notice of the proposed sale and overbid opportunity upon all potential purchasers identified by the Debtor, and the Debtor and Moelis actively attempted to find qualified overbidders. Several parties executed non-disclosure agreements and had access to an overbid electronic dataroom established by the Debtor and conducted extensive due diligence to better understand the Debtor's business. While a number of financially qualified parties engaged in various stages of due diligence, ultimately no party submitted an overbid. As a result, the Debtor proceeded with its sale motion at a scheduled hearing on December 21, 2015, seeking Court approval of the Debtor's asset sale to Pandora in accordance with the terms of the APA.

On December 23, 2015, the Debtor and Pandora closed the sale of substantially all of the Debtor's assets to Pandora pursuant to the terms of the APA and the sale order. In connection with the sale, the Debtor received the sum of $75,000,000 from Pandora.

## C.      Sony's Proof Of Claim.

On March 18, 2016, Sony filed a proof of claim in the Debtor's bankruptcy case, designated as Claim No. 54 on the Court's claim register (the "Sony Bankruptcy Claim" or "Bankruptcy Claim"), a true and correct copy of which is attached as Exhibit 1 to this Memorandum. The Sony Bankruptcy Claim asserts, *inter alia*, claims against the Debtor for fraudulent inducement and unjust enrichment. Sony's fraudulent inducement and unjust enrichment claims relate to a Content Distribution Agreement dated as of May 28, 2010, as amended, and a 2015 Renewal Amendment dated as of April 15, 2015. *See* Sony Bankruptcy Claim, page 4 of 31. In essence, the Sony Bankruptcy Claim alleges that the Debtor fraudulently induced it to renew the Content Agreement by failing to apprise Sony of a potential bankruptcy filing and sale to Pandora. The Debtor intends to object to the Sony Bankruptcy Claim and vehemently disputes the allegations set forth therein.

## D.      Sony's New York Action.

Just over two weeks after filing the Sony Bankruptcy Claim, on April 4, 2016, Sony commenced an action in the Southern District of New York, titled *Sony Music Entertainment v. Anthony Bay, Elliott Peters, and Jim Rondinelli*, Case No. 1:16-cv-02505-RJS (the "NY Action") asserting virtually identical fraudulent inducement and unjust enrichment claims against certain officer and employees of the Debtor as the ones detailed in the Bankruptcy Claim. A true and correct copy of the complaint (the "NY Complaint") filed in the New York Action is attached as Exhibit 2 to this Memorandum.

The NY Action was filed against the Debtor's Chief Executive Officer Anthony Bay, the Debtor's General Counsel and Senior Vice President Elliott Peters, and the Debtor's Head of Content and Catalog Acquisition and Senior Vice President Jim Rondinelli, all of whom have been intimately involved in administration of the Debtor's bankruptcy estate. All of Sony's allegations against Mssrs. Bay, Peters, and Rondinelli concern actions taken by them solely in their capacity as officers and employees of the Debtor. The only material difference between the NY Action and the Sony Bankruptcy Claim is that the NY Action was asserted against certain officers and employees of the Debtor, rather than the Debtor itself.

At bottom, via the NY Action, Sony seeks to have its claims against the Debtor for fraudulent inducement and unjust enrichment litigated outside of the Bankruptcy Court. Virtually all of the allegations set forth in the Sony Bankruptcy Claim concerning fraudulent inducement and unjust enrichment claims are also made in the NY Action. The entirety of the NY Action involves contracts between Sony and the Debtor, not the non-debtor defendants. Moreover, all of the allegations against the non-debtor defendants concern actions taken by the non-debtor defendants as agents for, and on behalf of, the Debtor.

One only needs to read the Sony Bankruptcy Claim and the NY Complaint to understand their identical nature. For ease of reference, the chart attached as Exhibit 5 to this Memorandum provides examples to show the similarity of the allegations. The chart demonstrates that while the Debtor is not a named defendant in the NY Action, the actual allegations set forth in the NY Complaint are, in fact, allegations made directly against the Debtor, and are virtually identical to the allegations set forth in the Bankruptcy Claim.

**E.** **The NY Action Will Distract Key Individuals Involved In The Debtor's Bankruptcy.**

The targets of the NY Action, Mr. Bay, Mr. Rondinelli, and Mr. Peters, were all crucial to the successful sale of the Debtor's assets, and continue to be critical to the administration of the Debtor's chapter 11 case. Mr. Bay continues to be employed by the Debtor as the CEO, and is actively involved in the administration of the Debtor's estate, including the wind down of its business, addressing claims issues and responding to the needs of professionals, the Official Committee of Unsecured Creditors, and parties in interest.

Mr. Peters remains the general counsel of the Debtors and remains involved in the administration of the Debtor's chapter 11 case, including without limitation, the analysis and reconciliation of claims filed against the Debtors, the plan negotiation, preparation, filing, and confirmation process, the day to day administrative affairs of the Debtor's estate, the review of pleadings filed in the case and the preparation of responses to such pleadings, discussions with the Committee, responses to creditor queries, and related matters. Mr. Peters remains a critical asset to the Debtor's bankruptcy estate due to his institutional knowledge of the Debtor's assets

and liabilities, and claims filed against the Debtor. Mr. Peters is the designated responsible individual for the Debtor.

Mr. Rondinelli, with benefit of his institutional knowledge of the Debtor's business through his role as Head of Content and Catalog Acquisition and Senior Vice President, has provided critical information and assistance to Mr. Bay and Mr. Peters throughout the bankruptcy proceeding, which significantly assists their administration of the Debtor's estate.

The Debtor requires the involvement and attention of Mr. Bay, Mr. Peters, and Mr. Rondinelli to the administration of the Debtor's bankruptcy estate. The NY Action will divert the attention of Mr. Bay, Mr. Peters, and Mr. Rondinelli from the administration of the Debtor's bankruptcy estate, especially given that the NY Action accuses them of fraud individually as defendants, which is causing Mssrs. Bay, Peters, and Rondinelli a significant amount of both personal and professional harm.

**F.** **Indemnification Claims of Mr. Bay, Mr. Peters, and Mr. Rondinelli.**

On March 21, 2016, Mr. Peters filed a proof of claim against the Debtor, asserting, among other claims, "all rights and remedies under any applicable company organization documents, including its certificate of incorporation and bylaws and other constitutive documents; all rights of indemnification for actions arising during the pre-petition period (i.e., prior to November 16, 2015), including attorney's fees and other related costs, under any agreement, policy or practice of Debtor or otherwise under applicable law; and all rights with respect to any applicable director and officer liability insurance." A true and correct copy of Mr. Peters' proof of claim is attached as Exhibit 3 to this Memorandum of Law.

On March 21, 2016, Mr. Bay also filed a proof of claim against the Debtor, asserting, among other claims, "all rights and remedies under any applicable company organization documents, including its certificate of incorporation and bylaws and other constitutive documents; all rights of indemnification for actions arising during the pre-petition period (i.e., prior to November 16, 2015), including attorney's fees and other related costs, under any agreement, policy or practice of Debtor or otherwise under applicable law; and all rights with respect to any applicable director and officer liability insurance." A true and correct copy of Mr.

1 Bay's proof of claim is attached as Exhibit 4 to this Memorandum of Law. Mr. Rondinelli also
2 intends to assert a similar proof of claim seeking indemnification. Mr. Peters, Mr. Bay, and Mr.
3 Rondinelli are asserting indemnification claims against the Debtor in connection with the
4 allegations made by Sony in the NY Action.

5 The Debtor's Bylaws and Certificate of Incorporation provide for indemnification by the
6 Debtor of officers and directors in connection with any suit or action in which such person is
7 named by virtue of being an officer or director, or serving in such capacity, and provide that the
8 Debtor may grant rights to indemnification to employees. Mr. Bay, Mr. Peters and Mr.
9 Rondinelli are officers, directors, and/or employees of the Debtor. Mr. Bay's employment
10 agreement with the Debtor, dated November 14, 2013, also includes an indemnification
11 agreement between the Debtor and Mr. Bay.

12 **G.     The Debtor's Insurance Policies And Proceeds Of Those Policies.**

13 Consistent with its Bylaws, Certificate of Incorporation and terms of employment, the
14 Debtor also has applicable insurance coverage extending to claims against the Debtor, or
15 executives or employees of the Debtor asserting, among other things, breach of duty, neglect,
16 error, misstatement, misleading statement, omission or act of the Debtor or of such executives or
17 employees. The insurance policies constitute property of the Debtor's bankruptcy estate.
18 Proceeds from those insurance policies may also constitute property of the Debtor's bankruptcy
19 estate. The NY Action, if allowed to continue, will substantially diminish the amount of
20 coverage available under the Debtor's directors and officers liability insurance policies.
21 Defense counsel has been retained for the defendants in the NY Action, with the consent of the
22 insurer. As the policy is a "wasting" policy, the ongoing defense costs have and will continue to
23 reduce the amount of insurance proceeds available under the policies.

24 ## III.     ARGUMENT

25 **A.     This Court Has Jurisdiction Over The Claims Asserted In The NY Action.**

26 This Court has subject matter jurisdiction over the claims asserted in the NY Action and
27 the Bankruptcy Claim because the claims are "related to" the Debtor's Chapter 11 bankruptcy
28 case within the meaning of 28 U.S.C. § 1334(b), which provides:

Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b).

A proceeding is "related to" a bankruptcy case if "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *See Feitz v. Great Western Savings (In re Feitz)*, 852 F.2d 455, 457 (9th Cir. 1988) (adopting the definition set forth in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." *Pacor*, 743 F.2d at 994.

A bankruptcy court has "related to" jurisdiction over claims brought by third parties against non-debtor entities where: (a) the debtor had contractual indemnification obligations to such non-debtor entities, (b) the debtor had obligations to defend and indemnify such non-debtor entities under common-law theories such as respondeat superior, vicarious liability, and principal/agent liability, (c) continuation of the action at issue would require the involvement of key personnel of the debtor, distracting such personnel from the bankruptcy case and thereby impacting the debtor's ability to administer its bankruptcy case, and (d) continuation of the action without the involvement of the debtor may later impair the debtor's ability to fully defend against the underlying claims by operation of collateral estoppel. *In re Phila. Newspapers*, 407 B.R. 606, 612-15 (E.D. Pa. 2009); *see also Jackson v. Fenway Partners, LLC*, 2013 2013 WL 1411223 at *2 (N.D. Cal. Apr. 8, 2013) (unpublished decision) ("[T]his case does involve claims for indemnification, which could conceivably have an effect on the Debtors' bankruptcy estate and could alter their rights and liabilities. Thus, the Court concludes that this action is related to the Bankruptcy Proceedings.").

Under these standards, the NY Action is "related to" the Debtor's Chapter 11 bankruptcy case. Specifically, the Debtor has obligations to indemnify the non-debtor defendants.

Continuation of the NY Action would force the Debtor's key personnel to devote significant time and resources to their defense against the NY Action, thereby impeding the ability of the Debtor to administer its bankruptcy case. Finally, continuation of the NY Action and the issuance of any determination or judgment on Sony's claims and allegations made in the NY Action would render the Debtor unable to defend itself against the same claims that Sony has made in the Bankruptcy Claim. For all of these reasons, "related to" jurisdiction exists in this Court over the claims asserted in the NY Action.

**B.** **The Court Should Issue A Temporary Restraining Order And Preliminary Injunction Prohibiting Sony From Continuing To Prosecute The NY Action Against The Non-Debtor Defendants Pending A Resolution Of Sony's Bankruptcy Claim.**

Rule 65 of the Federal Rules of Civil Procedure, made applicable to bankruptcy cases by Rule 7065 of the Federal Rules of Bankruptcy Procedure, provides the procedural framework for issuance of temporary restraining orders and preliminary injunctions. "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). In general, the showing required for a temporary restraining order and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir.2001).

*Winter* did not expressly address whether "sliding scale tests," in which the particular presence of one factor could, in combination with other factors, make up for the lesser presence of another factor, remain viable. *See, e.g., Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.2d 810, 813 (9th Cir. 2003) (stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits). The Ninth Circuit addressed the issue and held "that the 'serious questions' version of the sliding scale test for preliminary injunctions

remains viable after the Supreme Court's decision in *Winter*." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).

Pursuant to controlling Ninth Circuit law, the Court can issue an injunction under Bankruptcy Code Sections 105(a) and 362(a) to stay a proceeding in which the debtor is not a party. *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086 (9th Cir. 2007). The test for obtaining a Section 105 injunction extending the stay to cover the continued prosecution of non-debtor parties is the same as the traditional test employed for a preliminary injunction. *Id.* at 1094. ("We hold that the usual preliminary injunction standard applies to stays of proceedings against non-debtors under § 105(a).").[2] The "sliding scale test" applies so that a stronger showing on one element lessens the required showing on other elements. *Id.* at 1093-96. As set forth above and below, all of the foregoing factors are satisfied in this case.

Although the moving party has the burden of persuasion when seeking a preliminary injunction, because the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, as well as the haste that is often necessary in obtaining such relief, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175

---

[2] In *Solidus*, the Ninth Circuit commented on *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986). In that case, the Fourth Circuit employed an "unusual circumstances" test to extend the automatic stay to claims against a non-debtor officer where the interests of the debtor and its officer were inextricably intertwined. *Solidus*, 502 F.3d at 1098. Although the Ninth Circuit appears to indicate that the satisfaction of the "unusual circumstances" test alone cannot form a basis to extend the automatic stay to non-debtor litigants, *id.* at 1098, the Court went on to state that the "unusual circumstances" test might be viable, but that the Court did not need to reach the issue because there was no proof in the record that there was such an identity between the debtor and non-debtor officer that a judgment against the non-debtor officer would be tantamount to a judgment against the debtor. Here, as discussed above and below, there is ample and persuasive evidence that the interests of the Debtor and the non-debtor defendants are inextricably intertwined, and that a judgment against the non-debtor defendants amounts to a judgment against the Debtor. Thus, to the extent the "unusual circumstances" test remains viable, it is easily satisfied here.

(1981).   Indeed, the Ninth Circuit has held that in light of the urgency of obtaining a preliminary injunction, the trial court may even give some weight to otherwise inadmissible evidence when to do so serves the purpose of preventing irreparable harm before trial.  *Flynt Distributing Company, Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  For the reasons explained below, the Debtors respectfully submit that all of the factors to be considered by the Court in determining whether to issue a temporary restraining order and preliminary injunction, whether under the traditional test or the "sliding scale" test, weigh in favor of issuance of a preliminary injunction in this action.

## 1.     The Debtor Is Likely To Succeed On The Merits.

To establish a likelihood of success on the merits, the moving party must show a "fair chance" of success on its claims.  *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir.2004), *cert. den., Rubin v. Pringle*, 544 U.S. 923, 125 S.Ct. 1674, 161 L.Ed.2d 482 (2004), quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (*en banc*); *Crum v. Blixeth (In re Big Springs Realty LLC)*, 426 B.R. 860, 865 (Bankr. D. Mont. 2010).

By way of the Complaint, the Debtor is seeking a declaratory judgment establishing that the NY Action violates the automatic stay under section 362 of the Bankruptcy Code, or, alternatively, that the automatic stay should be extended pursuant to the Court's authority to enjoin Sony from further prosecuting the NY Action. For the reasons explained below, the Debtor is likely to prevail on both of these grounds.

Section 362(a)(1) of the Bankruptcy Code operates as a stay, "applicable to all entities," of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."

Section 362(a)(3) of the Bankruptcy Code operates as a stay, "applicable to all entities," of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

It is well-established that "'[t]he automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors … [and] permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." *In re Roberts*, 175 B.R. 339, 343 (B.A.P. 9th Cir. 1994) (*citing* Notes of the Committee on the Judiciary, H.R. Rep. No. 595, 95th Cong., 1st Sess. 340-41 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6296-97). It is equally established that the automatic stay provided by Section 362 can be extended pursuant to an injunction granted under Section 105(a) of the Bankruptcy Code. *Solidus*, 502 F.3d at 1094.

In the present case, the automatic stay can and should be extended in order to stay continued prosecution of claims against the non-debtor defendants in the NY Action.  Here, Sony pled claims against the non-debtor defendants in the NY Action impossible to separate from the claims asserted against the Debtor in the bankruptcy case.  Allowing Sony to prosecute the NY Action, therefore, is tantamount to allowing Sony to prosecute its Bankruptcy Claim outside the jurisdiction of the Bankruptcy Court to the obvious detriment of the Debtor, the Debtor's estate, and creditors.

### (a)     The Debtor Is The Actual Defendant In The NY Complaint.

The allegations set forth in the Bankruptcy Claim are virtually identical to the allegations set forth in the NY Complaint, and Sony will be required to prove the same allegations that are in its Bankruptcy Claim in the NY Action.  While the Debtor is not named in the NY Action (because that would be too blatant a violation of the automatic stay), in reality the NY Action consists of numerous allegations directly against the Debtor.  Furthermore, while the Debtor is not named as a party in the NY Action and is not represented by counsel in the NY Action, it is still exposed to the risk that legal or factual findings will be made in the NY Action that will severely prejudice its ability to defend against the Bankruptcy Claim.  Thus, if the NY Action is not stayed against the non-debtor defendants, any factual or legal findings against them may be binding against the Debtor under the doctrines of issue or claim preclusion or some other rule of law or equity that may have a preclusive effect.

Sony's very allegations in the NY Action betray its intent to target the Debtor. Below are a few examples of allegations Sony makes directly against the Debtor in the NY Action (emphasis added):

- "To enable its deal with Pandora, **Rdio concealed the material facts of that deal from SME, and fraudulently induced SME to extend the Content Agreement and enter into the Renewal Amendment**[.]" *See* NY Complaint ¶ 40.

- "Between October 2014 and September 2015, **SME and Rdio negotiated** the terms of an amendment to the Content Agreement." *See* NY Complaint ¶ 8.

- "Unbeknownst to SME, however, at the same time that **Rdio was negotiating the amendment to its Content Agreement with SME**, it was simultaneously negotiating its deal with Pandora – under which Rdio would file for bankruptcy[.]" *See* NY Complaint ¶ 10.

- "[H]ad SME learned about **Rdio's negotiations** with Pandora at any time during the negotiations to amend the Content Agreement, SME would have demanded immediate payment of the $5.5 million that **Rdio owed to SME**, and would have **refused to grant Rdio further access** to the recordings owned by SME. That in turn would have substantially diminished **Rdio's business** and jeopardized the secret proposed sale to Pandora." *See* NY Complaint ¶ 11.

- "Unbeknownst to SME at the time, **Rdio had** *one day earlier* signed a Letter of Intent with Pandora concerning the intended bankruptcy filing, which would prevent **Rdio's performance of its obligations to SME** under the Renewal Amendment. **Rdio never intended to fulfill the commitments** it made in the Renewal Amendment." *See* NY Complaint ¶ 14.

- "As detailed below, **Rdio ultimately succeeded in hiding the Pandora deal from SME** until November 16, 2015, the date on which **Rdio and Pandora** signed an Asset Purchase Agreement and Rdio filed for Chapter 11 relief." *See* NY Complaint ¶ 16.

- "SME was damaged as the result of its reasonable reliance **on Rdio's knowing and material representations and omissions**. **Rdio never paid SME the $5.5 million Minimum Revenue Guarantee**, nor did it pay the $2 million prepayment under the Renewal Amendment, nor did it pay SME the amounts it owed for use of SME's content in August, September, and October of 2015, even though Rdio's users continued to stream recordings owned by SME." *See* NY Complaint ¶ 54.

Although section 362(a), on its face, is limited in application to the debtor, it has routinely been applied by courts to stay litigation against non-debtor parties where, as here, the relationship between the debtor and the non-debtor is so intertwined that their interests in the litigation cannot be separated. Under such circumstances, if "there is such identity between the

debtor and a third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor," the pending litigation against such third-party defendant may be stayed pursuant to section 362(a). *McCartney v. Integra Nat'l Bank N.*, 106 F.2d 506, 510 (3d Cir. 1997) (*quoting A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)); *See In re Family Health Servs., Inc.,* 105 B.R. 937, 942-43 (Bankr. C.D. Cal. 1989).

Courts have regularly stayed litigation against a debtor's officers and directors following a determination that the interests of such officers and directors are inextricably intertwined with the interests of the debtor. *See*, *e.g.*, *A.H. Robins Co.*, 788 F.2d at 999 (staying litigation against officers and directors and noting that "[w]here … a debtor and nondebtor are so bound by statute or contract that the liability of the non-debtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code … Clearly the debtor's protection must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate, and this is so, whether the debtor is a party or not") (internal quotations and citations omitted); *Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.)*, 26 B.R. 420, 428 (Bankr. S.D.N.Y. 1983), aff'd, 40 B.R. 219 (S.D.N.Y. 1984), *rev'd in part on other grounds*, 41 B.R. 926 (S.D.N.Y. (1984) (staying a class action alleging securities law violations against current and former directors where the litigation's "true object is the debtor itself" and "[a]n adverse judgment … would have serious consequences for the debtor's estate"); *In re Continental Airlines, Inc.*, 177 B.R. 475, 479-81 (D. Del. 1993) (upholding the bankruptcy court's extension of the automatic stay to bar the prosecution of stockholder suits against non-debtor officers and directors because the debtor was the "real defendant"); *In re Family Health Servs., Inc.,* 105 B.R. 942-43 (staying direct billing actions where the debtor is the (real party defendant due to indemnification rights).

A plain reading of the NY Complaint leaves only one conclusion, and that is the allegations pertaining to, or claims against, the non-debtor defendants in the NY Complaint are also against the Debtor, and cannot reasonably be segregated one from the other. In fact, the

conduct of the non-debtor defendants in the NY Action are limited to the conduct of such persons solely in their capacity as employees and/or executives of the Debtor, and any discovery served upon such parties will undoubtedly focus on the Debtor. Under these circumstances, a finding of liability against the non-debtor defendants could necessitate a finding of liability against the Debtor. Accordingly, a judgment against the non-debtor defendants "will in effect be a judgment or finding against" the Debtor. *A.H. Robins Co.*, 788 F.2d at 999.

Since all claims against the Debtor are stayed under Section 362(a) and the claims against the Debtor cannot be separated from the claims against the non-debtor defendants, all of the claims asserted in the NY Complaint should be stayed, and the Debtor is entitled to a declaratory judgment establishing the same.

**(b)**      **The Bankruptcy Claim Will Be Administered In This Case Pursuant To The Claim Administration And Plan Confirmation Process.**

In *Solidus*, the Ninth Circuit found that the first element of the preliminary injunction standard, likelihood of success on the merits, should be interpreted as requiring a showing of "a reasonable likelihood of successful reorganization." *Solidus*, 502 F.3d at 1095-96. "[I]t is not a high burden to show a reasonable likelihood of success in reorganization." *see Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d at 1095-1096. In that case, the Ninth Circuit observed that "[t]he inquiry for a preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the merits of the questions giving rise to the litigation will be decided." *Id.* In the context of that case, the Ninth Circuit found that "the most relevant 'future proceeding' is the debtor's reorganization." *Id.* (internal citation omitted.)

In this case, the most relevant "future proceedings" are this Court's determination of Sony's Bankruptcy Claim, the claim administration process, and the plan confirmation process. In this case, since the Petition Date, the Debtor has expeditiously formulated and executed a sale process which led to the successful sale of its assets. The Debtor has also proposed a plan of reorganization and filed a disclosure statement within the Debtor's exclusivity period for filing a plan. The Debtor has engaged its secured creditors and the Official Committee of

Creditors Holding Unsecured Claims in discussions regarding a consensual plan in this case, and firmly believes it is making progress on that front. The Debtor also intends to administer claims against the estate in the manner provided for in the Bankruptcy Code. The NY Action, on the other hand, is designed to and will hinder the Debtor's efforts, interfere with the administration of the Debtor's bankruptcy estate, and serve as an end-run around the protections of the Bankruptcy Code afforded the Debtor and the Debtor's estate. Accordingly, the Debtor requests - indeed, it requires - an injunction so it can further the administration of its bankruptcy estate, including the liquidation of the Bankruptcy Claim. All of the foregoing establishes that the Debtor has a reasonable likelihood of successful reorganization, thereby satisfying the first factor in the injunction analysis.

**2.**     **<u>The Debtor Is Likely To Suffer Irreparable Harm In The Absence Of An Injunction.</u>**

The Debtor is likely to suffer irreparable harm in the absence of an injunction for a number of reasons, including: (a) continuation of the NY Action would result in a significant risk of res judicata or claim or issue preclusion to the Debtor's detriment; (b) continuation of the NY Action would result in indemnification claims which would further jeopardize property of the Debtor's estate; (c) continuation of the NY Action would result in the dissipation of insurance proceeds which may ultimately belong to the Debtor's estate; and (d) continuation of the NY Action poses a significant distraction for Mssrs. Bay, Peters, and Rondinelli from the affairs of the Debtor's estate, including the administration of claims against the estate.

These concerns "would require [the Debtor] to defend the actions as fully as if [it] were named," which is precisely what the automatic stay is intended to excuse [it] from doing." *In re Am. Film Tech, Inc.*, 175 B.R. 847, 851 (Bankr. D. Del. 1994); *see also In re Sudbury*, 140 B.R. 461, 465 (Bankr. N.D. Ohio 1992) (granting injunction as to non-debtors and observing "[t]he realities of this case are that Plaintiffs' actions [against non-debtors] would require the Debtor to become embroiled in major litigation at a time when its efforts should be directed toward reorganization"); *In re Calpine Corp.*, 354 B.R. 45, 49-50 (Bankr. S.D.N.Y. 2006) <u>aff'd</u>. 365 B.R. 401 (S.D.N.Y. 2007) (noting that "[c]ourts . . . enjoin litigation against non-debtors when

an adverse judgment in the litigation will collaterally estop the debtor in subsequent litigation" and extending the automatic stay to co-defendants in light of "a significant risk of collateral estoppel, stare decisis and evidentiary prejudice") (citations omitted)).

### (a) Continuation of the NY Action Would Result In a Significant Risk of Res Judicata or Claim or Issue Preclusion to the Debtor's Detriment.

As the Debtor is the true target of the NY Action, it follows that if Sony is not enjoined from further violating the automatic stay, the Debtor and its estate will suffer immediate and irreparable harm. As noted above, the Debtor is not named in the NY Action nor is it represented by counsel in that litigation. If the NY Action continues against the token non-debtor defendants, and adverse factual or legal findings are made by the District Court in New York, the Debtor could be estopped from re-litigating or otherwise contesting such adverse findings even though it did not participate or have a meaningful opportunity to participate in the NY Action, and will not have standing to appeal from an adverse judgment. *See, e.g.*, *In re Am. Film Techs., Inc.*, 175 B.R. 847, 849-855 (Bankr. D. Del. 1994) (staying litigation against non-debtor officers and directors of the debtor because the debtor could be collaterally estopped in the event of an adverse judgment against such officers and directors). The risk is especially pressing where the claims at issue arise out of a third party's employment by the debtor, as there are additional theories of vicarious liability, respondeat superior, and principal/agent liability which may impute such liability to the debtor. *See id.* at 850 ("Such liability exposes the corporation to both vicarious liability under the doctrine of *respondeat superior* … and the risk of being collaterally estopped from denying liability for its directors' actions").

Separate and apart from the risk of collateral estoppel, there is an additional risk that the principle of *stare decisis* may apply, and future courts may follow the decision or verdict rendered in the NY Action, again, without the opportunity to present any meaningful defense. *See Adelphia Commc'ns Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.* (*In re Adelphia Commc'ns Corp.*), 302 B.R. 439, 451-52 (Bankr. S.D.N.Y. 2003) (extending stay to litigation against non-debtor parties where "there is a considerable *stare decisis* risk [as to the debtor], apart from any collateral estoppel risk").

In sum, if Sony is permitted to pursue the NY Action against the non-debtor defendants, the Debtor will be exposed to a significant risk of collateral estoppel, stare decisis and evidentiary prejudice because Sony's fraudulent inducement and unjust enrichment claims are contingent upon a finding of the Debtor's liability. In addition, any finding adverse to the non-debtor defendants also presents a heightened risk to the Debtor, as the actions of the non-debtor defendants may be imputed to the Debtor under theories of vicarious liability, respondeat superior, and principal/agent liability. The Debtor, nevertheless, as a non-party to the NY Action, cannot participate in the defense of the non-debtor defendants against Sony's claims, and its later efforts to defend against Sony's Bankruptcy Claim will be impeded as a result.

**(b)** **Continuation of the NY Action Would Result in Indemnification Claims Which Would Further Jeopardize Property of the Debtor's Estate.**

Any judgment against the non-debtor defendants in the NY Action would also amount to a judgment against the Debtor for the additional reasons that the non-debtor defendants have contractual and common law indemnification and contribution claims against the Debtor for any judgment entered against them. Under these circumstances, an injunction is warranted because the indemnification obligations would still leave the Debtors as real party defendants in the NY Action and effectively eliminate the protections of the automatic stay. *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986). Thus, courts have consistently extended the stay and enjoined actions against non-debtors where, as here, the debtor has a clear obligation to indemnify the non-debtor. *Maxicare Health Plans, Inc. v. Centinela Mammoth Hospital (In re Family Health Services, Inc.),* 105 B.R. 937, 942 (Bankr. C.D. Cal. 1989) (automatic stay applies where non-debtor has right of indemnification against debtor); *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003) (identifying indemnification obligations as an example of where extending the stay is warranted and citing authority extending the stay because of those obligations); *In re Cont'l Airlines, Inc.*, 177 B.R. 475, 479 (D. Del. 1993) (affirming the bankruptcy court's extension of the stay to the debtor's officers and directors where allegations made clear that the debtor was the real target of the litigation, debtor was

obligated to indemnify its directors and officers and several of the officers and director were heavily involved in the debtors' reorganization efforts); *see also In re L.A. Dodgers LLC*, 465 B.R. 18, 35-36 (Bankr. D. Del. 2011) (granting preliminary injunction where debtor would suffer adverse economic consequences); *In re Phila. Newspapers*, 407 B.R. 606, 616 (E.D. Pa. 2009) (noting that protection of automatic stay is warranted where "the Debtors owe potential contractual and common law duties to indemnify the Non-Debtors"); *McCartney v. Integra Nat'l Bank N.*, 106 F.2d 506, 510-11 (3d Cir. 1997) (relying, in part, on *A. H. Robins Co.*, and holding that the automatic stay prevented pursuit of a deficiency judgment against a non-debtor third party where the debtor was liquidating its assets under chapter 7 of the Bankruptcy Code).

These obligations to indemnify that would hold the Debtor liable are inconsistent with the "breathing spell" contemplated by the automatic stay.  *Manville*, 26 B.R. at 425. The obligations are also inconsistent with the Bankruptcy Code's goal of filtering all claims against the Debtor into a single, consolidated proceeding.

As noted above, the Debtor owes both contractual and common-law indemnification claims to the non-debtor defendants, and is also obligated to defend the non-debtor defendants against claims arising from their roles with respect to the Debtor.  These claims and obligations may result in significant economic harm to the Debtor and corresponding harm to property of the Debtor's estate.  All of these factors weigh in favor of protecting the assets of the Debtor's estate by staying the NY Action.

> **(c)**      **Continuation of the NY Action Would Result in the Dissipation of Insurance Proceeds Which May Ultimately Belong to the Debtor's Estate.**

As set forth above, the Debtor has applicable liability insurance coverage extending to claims against the Debtor, or executives or employees of the Debtor asserting, among other things, breach of duty, neglect, error, misstatement, misleading statement, omission or act of the Debtor or of such executives or employees.

The NY Action, if allowed to continue, will substantially diminish the amount of coverage available under the Debtor's directors and officers insurance policies.  Defense

counsel has been retained for the defendants in the NY Action with the consent of the insurer. As the policy is a "wasting" policy, the ongoing defense costs have and will continue to reduce the amount of insurance proceeds available under the policies. The insurance policies constitute property of the Debtor's bankruptcy estate, and proceeds from those insurance policies may also constitute property of the Debtor's bankruptcy estate.

In such circumstances, courts have held that the continued prosecution of litigation against officers or directors of the Debtor "affects debtor's property interests in a valuable estate asset in violation of the automatic stay." *See Circle K Corp. v. Marks (In re Circle K Corp.)*, 121 B.R. 257, 261 (Bankr. D. Az. 1990) (finding that, where continued prosecution of action against non-debtors would dissipate insurance proceeds and debtor may be liable for indemnification after insurance proceeds were exhausted, the automatic stay precluded continued prosecution, or alternatively, prosecution of action should be enjoined pursuant to section 105 of the Bankruptcy Code).

> **(d)     Continuation of the NY Action Will Entail a Significant Distraction of Mssrs. Bay, Peters, and Rondinelli.**

"In a bankruptcy context, irreparable harm may be discerned if 'the action sought to be enjoined would so consume the time, energy and resources of the debtor that it would substantially hinder the debtor's reorganization effort.'" *In re Baldwin-United Corp.*, 57 B.R. 759, 768 (S.D. Ohio 1985) (*quoting In re Anje Jewelry Co., Inc.*, 47 B.R. 485, 487 (E.D.N.Y. 1983)).  Here, allowing Sony to proceed on its claims in the NY Action would divert Mssrs. Bay's, Peter's, and Rondinelli's attention from the task of furthering the Debtor's efforts to administer its estate.

Courts have routinely enjoined actions brought against non-debtors where the non-debtors are providing services and attention that are critical to the ongoing proceeding.  In one such case, for example, a court stayed a creditor action against third parties of the debtor where an officer devoted over 50% of his time to, and was "irreplaceable" in, the debtor's reorganization effort, where an officer was a "key staff member" of the task force managing the bankruptcy case, where the principals performed all or most of the debtor's business, and where

the general partner was "intimately connected" with the management of the debtor's business. *Chase Manhattan Bank v. Third Eighty-Ninth Assocs. (In re Third Eighty-Ninth Assocs.)*, 138 B.R. 144, 147 (S.D.N.Y. 1992) (internal citation omitted); *see also Homestead Holdings, Inc. v. Broome & Wellington (In re PTI Holding Corp.)*, 346 B.R. 820, 830 (Bankr. D. Nev. 2006) ("The loss of the time and talents of the Greensteins would bring about irreparable harm to Homestead.").

Mr. Bay, the Debtor's Chief Executive Officer, continues to be employed by the Debtor, and is actively involved in the administration of the Debtor's estate, including the wind down of its business, addressing claims issues and responding to the needs of professionals, the Official Committee of Unsecured Creditors, and parties in interest. Mr. Peters, the Debtor's General Counsel, remains an employee of the Debtor involved in the administration of the Debtor's chapter 11 case, including without limitation the foregoing matters. Mr. Rondinelli, a former Senior Vice President of the Debtor, has provided critical information and assistance to Mr. Bay and Mr. Peters throughout the bankruptcy proceeding, which has aided their administration of the Debtor's estate. Mr. Bay, Mr. Peters, and Mr. Rondinelli remain critical assets to the Debtor's bankruptcy estate due to their institutional knowledge of the Debtor's assets and liabilities, claims filed against the Debtors, and the Debtor's dealings with Sony.

The NY Action will divert the required attention of Mr. Bay, Mr. Peters, and Mr. Rondinelli from the administration of the Debtor's bankruptcy estate, given that the NY Action names them individually as defendants, despite the fact that all of the allegations set forth in the NY Action and the NY Complaint are based on alleged actions of Mssrs. Bay, Peters and Rondinelli solely in their capacity as executives and employees of the Debtor.

The NY Action represents a significant distraction to these key actors of the Debtor at a time when their attention must be focused on the administration of the Debtor's bankruptcy estate, the formulation and confirmation of a plan, and the administration of creditor claims against the Debtor. To force these individuals to shift their attention, resources and efforts to defending the NY Action would not only be unnecessary and unfair to each of them, it would be truly debilitating for the Debtor.

**3. The Balance Of Hardships Weighs Heavily In The Debtor's Favor.**

The balance of hardships overwhelmingly favors granting the Debtor the request to enter an injunction under Sections 105(a) and 362(a) extending the automatic stay to claims asserted by Sony against non-debtor defendants in the NY Action. In the absence of such relief, the Debtor will suffer all of the substantial, irreversible harms described above. Sony, by comparison, will not suffer any hardship since it may (i) litigate its Bankruptcy Claim (that implicates virtually all of the issues raised in the NY Action), and (ii) seek to estimate the Bankruptcy Claim. Any purported delay in pursuing the NY Action is illusory and, therefore, can hardly be considered as tipping the hardship scales in its favor. *See*, *e.g.*, *In re Lazarus*, 161 B.R. at 901 ("[t]he preliminary injunction will not invalidate the rights of [the creditor]" but rather "will merely delay the enforcement of those rights."); *PTI Holding*, 346 B.R. at 831-32 (Bankr. D. Nev. 2006) (holding that delay of pursuit of guaranty did not constitute sufficient harm to justify denial of injunction because "[t]he preliminary injunction will not invalidate the rights of [the creditor]" but rather "will merely delay enforcement of those rights"). Indeed, there will be no such delay because the claims in the NY Action are the same claims included in the Bankruptcy Claim, which will be resolved in this Court.

**4. The Injunction Serves The Public Interest To The Extent Applicable.**

A generalized public interest exists in favor of orderly liquidation under the Bankruptcy Code, and is central to maintaining the integrity of the bankruptcy system. *In re Arana*, 456 B.R. 161, 171 (Bankr. E.D.N.Y. 2011). The public interest is served by an efficient and orderly administration of the Debtor's estate, and distributions of assets to creditors pursuant to the distribution scheme set forth in the Bankruptcy Code. These interests would be frustrated if Sony is allowed to continue prosecuting claims and allegations against the Debtor in the NY Action, and it is particularly offensive since it is being done in the guise of prosecuting non-debtors when, in fact, it is a strategy for evading the automatic stay.

In conclusion, a fundamental goal of bankruptcy is to put creditors on an equal footing so as to maximize distributions to all creditors and to discourage creditors from engaging in a race to the courthouse. As stated in a leading treatise, "when a chapter 11 estate seeks to enjoin

a collection action against one of its insiders or officers, many courts have found a public policy in favor of reorganizations, and thus find that actions which promote reorganization serve the public interest; as a consequence, when all other factors are equal, reorganization will be preferred." 2 Collier on Bankruptcy ¶105.03[1][d] (16th ed.); *see also, Spiers Graff Spiers v. Menako (In re Spiers Graff Spiers)*, 190 B.R. 1001, 1012 (Bankr. N.D. Ill. 1996) ("The public interest served by issuing injunctions in Chapter 11 cases is the promotion of successful reorganizations."); *Litchfield Co. v. The Anchor Bank (In re Litchfield Co.)*, 135 B.R. 797,807 (W.D.N.C. 1992); *Lazarus Burman Assoc. v. National Westminster Bank (In re Lazarus Burman Assoc.)*, 161 B.R. 891, 898 (Bankr. E.D.N.Y. 1993).

Permitting Sony to continue unchecked in its pursuit of what are effectively claims against the Debtor in the NY Action would be contrary to public policy, and would risk significant harm to the Debtor, the Debtor's estate, and the Debtor's creditors. Therefore, the public interest will be advanced by extending the stay to cover claims asserted by Sony against the token non-debtor defendants.

## IV.    <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that the Court:

1.    Issue a temporary restraining order and preliminary injunction prohibiting Sony from continuing to prosecute any and all claims asserted by it in the NY Action, pending liquidation of its Bankruptcy Claim in this case;

2.    Enter an order extending the automatic stay under 11 U.S.C. §§ 105 and 362 to any claims asserted by Sony against the non-debtor defendants in the NY Action; and

3.    Enter an order affording such further and other relief as is warranted.

Dated: May 9, 2016

LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.

By:    */s/ Ron Bender*
RON BENDER
PHILIP A. GASTEIER
IRV M. GROSS
KRIKOR J. MESHEFEJIAN
Attorneys for Plaintiff Rdio, Inc.

# EXHIBIT "1"

**Fill in this information to identify the case:**

Debtor 1    Rdio, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Northern District of California

Case number    15-31430

Official Form 410

# Proof of Claim

12/15

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | |
| --- | --- |
| 1. **Who is the current creditor?** | Sony Music Entertainment |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

2. **Has this claim been acquired from someone else?**
☑ No
☐ Yes.  From whom?

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Name    Susan Meisel, Esq.

Number    25 Madison Avenue    Street

City    New York    State    NY    ZIP Code    10010

Contact phone    (212) 833-4537

Contact email    susan.meisel@sonymusic.com

**Where should payments to the creditor be sent?** (if different)

Name

Number    Street

City    State    ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

4. **Does this claim amend one already filed?**
☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ See attached rider _. **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached rider. _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| | ☐ **Yes.** *Check one:* | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.   $_____

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   03/18/2016
   MM / DD / YYYY

*Signature*

Print the name of the person who is completing and signing this claim:

| Name | Susan Meisel, Esq. | | |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Senior Vice President and Deputy General Counsel |
|---|---|

| Company | Sony Music Entertainment |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 25 Madison Avenue | | |
|---|---|---|---|
| | Number    Street | | |
| | New York | NY | 10010 |
| | City | State | ZIP Code |

| Contact phone | (212) 833-4537 | Email susan.meisel@sonymusic.com |
|---|---|---|

## RIDER TO PROOF OF CLAIM OF
## <u>SONY MUSIC ENTERTAINMENT</u>

1.    <u>Claimant</u>.  Sony Music Entertainment ("<u>SME</u>" or "<u>Claimant</u>") files this claim (the "<u>Claim</u>") against Rdio, Inc. ("<u>Rdio</u>"), as a debtor and debtor-in-possession (the "<u>Debtor</u>").

2.    <u>Bar Date</u>.  On November 23, 2015, the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "<u>Court</u>") entered a *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, and Deadlines* (the "<u>Bar Date Notice</u>"). [Docket No. 71.]  Pursuant to the Bar Date Notice, each person or entity asserting a prepetition claim or claims against the Debtor is required to file a proof of claim by March 21, 2016 (the "<u>Bar Date</u>").

3.    <u>Amount of Claim</u>.  As of the Petition Date, the Claimant has four claims against the Debtor:

    (a)    <u>Service Fees</u>.  Claimant has a claim against the Debtor pursuant to the terms of the Content Agreement (as defined below) in the total amount of $12,419,314.00 as set forth in Schedule A.

    (b)    <u>Indemnification</u>.  The Claimant has a contingent and unliquidated claim for indemnification pursuant to Section 6(d)(1) of the Content Agreement.

    (c)    <u>Fraudulent Inducement</u>.  The Claimant has a claim against the Debtor for fraudulently inducing the Claimant to enter into the 2015 Renewal Amendment (as defined below).

    (d)    <u>Unjust Enrichment</u>.  The Claimant has a claim against the Debtor for unjust enrichment arising out of its fraudulent conduct.

4.    <u>Basis of Service Fee and Indemnification Claims</u>.

    (a)    The Service Fee and Indemnification Claims arise out of a certain agreement dated as of May 28, 2010 [NT 10-64.3(1)] between Rdio, on the one hand, and SME, on the other hand, in connection with, *inter alia*, the distribution and exploitation of content

owned or controlled by SME through Rdio's online and mobile music subscription service (as amended, modified, or otherwise supplemented from time to time, the "Content Agreement").

(b) Pursuant to a letter agreement dated as of April 1, 2015 (the "2015 Renewal Amendment"), the parties agreed to amend the Content Agreement and to extend the term of the Content Agreement for two years, effective April 1, 2015, through March 31, 2017.

(c) Under the 2015 Renewal Amendment, Rdio was required to pay SME a total minimum revenue guarantee (the "Minimum Revenue Guarantee") for the two-year extension as set forth below:

- Year 1 Guarantee: $7,917,404, consisting of the sum of $3 million and $4,917,404, which represents the remaining minimum revenue guarantee owed pursuant to a certain January 2013 Amendment to the Content Agreement (the "March 2015 Unrecouped Balance"). If the Limited Free Offering and Unlimited Free Offering (as those terms are defined in the Content Agreement) were not fully removed from all territories before October 1, 2015, the amount of the Year 1 Guarantee increased by $750,000 for each calendar month after September 2015 in which these offerings were still in effect in year 1.

- Year 2 Guarantee: $4,000,000.00.

(d) Pursuant to Section 5(b) of the Content Agreement, upon the termination or expiration of the term of the Content Agreement, all monies then due or to become due to the Claimant are immediately due and payable.

(e) Pursuant to Section 6(d)(1) of the Content Agreement, the Debtor agreed to indemnify the Claimant from and against any and claims asserted by a third party arising out of (x) any breach or alleged breach by the Debtor of any representation, warranty, covenant or agreement made by the Debtor in the Content Agreement, (y) the distribution or operation of the Rdio subscription service, or (z) any allegation that any materials used or exploited by or on behalf of the Debtor in connection with the Subscription Service, in whole or in part, directly or

indirectly, infringe upon, misappropriate or otherwise violate the rights of any third party.

Section 6(d)(1) provides:

> (d)    (1) [The Debtor] will at all times indemnify and hold harmless the SME and its Affiliates and each of their respective officers, agents, employees, directors, and advisors (collectively, the "<u>SME Indemnified Parties</u>") from and against any and all claims asserted by a third party against any of the SME Indemnified Parties for damages, liabilities, costs and expenses (including court expenses and reasonable counsel fees) arising out of (x) any breach or alleged breach by [the Debtor] of any representation, warranty, covenant or agreement made by [the Debtor] herein, (y) the distribution or operation of the Subscription Service, or (z) any allegation that any materials used or exploited by or on behalf of [the Debtor] in connection with the Subscription Service (except for SME Materials or any other materials substantially in the form provided to [the Debtor] by SME for use in connection with this Agreement and where [the Debtor]'s use thereof is authorized hereunder but including, without limitation, use of any content licensed from third parties), in whole or in part, directly or indirectly, infringe upon, misappropriate or otherwise violate the rights of any third party (the "Company Claims").  Nothing contained in clause (z) of the preceding sentence shall be deemed to limit the applicability of [the Debtor]'s indemnification obligations, which, for the avoidance of doubt, shall apply with full force and effect regardless of the state of [the Debtor]'s knowledge concerning the infringement or violation of any such proprietary or intellectual property rights of any such third party. In the event of any Company Claim: (i) the applicable SME Indemnified Party shall notify [the Debtor] of the Company Claim concerned immediately following the date that such SME Indemnified Party becomes aware of it (provided that such failure to immediately notify [the Debtor] shall not affect any SME Indemnified Party's right to indemnification hereunder if such delay did not materially prejudice the defense of such claim); (ii) [the Debtor] shall defend against the Company Claim concerned (at [the Debtor]'s own expense) through legal counsel selected by [the Debtor]; and (iii) each party shall reasonably cooperate with the other in the defense of the Company Claim concerned. [The Debtor] shall be solely responsible for the amount of any settlement or judgment for such Company Claim and all legal expenses and counsel fees incurred by [the Debtor] in connection therewith; provided, however, that any settlement acknowledging any wrongdoing on behalf of any of the SME Indemnified Parties or creating any additional obligations or payments or potential liabilities for any of the SME Indemnified Parties shall be subject to the written approval of such SME Indemnified Parties. The applicable SME Indemnified Parties shall have the right at all times to actively participate in the defense thereof, and to employ legal counsel selected by such SME Indemnified Parties at their own expense, it being understood that [the Debtor] shall have the right at all times, in [the Debtor]'s sole discretion, to maintain control of the conduct of the defense.

(f)     As of October 1, 2015, and November 1, 2015, the Limited Free Offering and Unlimited Free Offering (as those terms are defined in the Content Agreement) had not been fully removed from all territories.  Accordingly, the Year 1 Guarantee increased by $750,000 for the month of October 2015 and by an additional $750,000 for the month of November 2015.

(g)     The Claimant terminated the Content Agreement by letter dated November 16, 2015 (the "Termination Notice").

(h)     On December 18, 2015, Rdio filed a *Supplemental Notice of Debtor's Determination to Reject Executory Contracts and Unexpired Leases* [Docket No. 141], indicating that it intended to reject the Content Agreement.

(i)     On December 22, 2015, the Court entered an order approving the sale of certain of the Debtor's assets to Pandora (the "Sale Order").  [Docket No. 151.]  Pursuant to Paragraph 30 of the Sale Order, the Content Agreement was deemed rejected as of the Closing Date of the sale to Pandora.[1]

(j)     On December 23, 2015, the asset sale to Pandora closed.

(k)     As a result of the termination of the Content Agreement, whether pursuant to the Termination Notice or the Sale Order, the entire Minimum Revenue Guarantee is due to the Claimant.

5.     Basis of Fraudulent Inducement and Unjust Enrichment Claims.

(a)     The Debtor fraudulently induced the Claimant to enter into the 2015 Renewal Agreement.

---

[1] The Claimant reserves the right to argue that the Content Agreement was terminated pre-petition pursuant to the Termination Notice.

(b)     Beginning in or around October 2014, Rdio sought to renegotiate its Content Agreement with SME, under which Rdio was required to pay SME a Minimum Revenue Guarantee of approximately $5.5 million by December 31, 2014.

(c)     SME initially agreed to an extension of the term of the Content Agreement to March 31, 2015, and then agreed to a series of extensions of the Content Agreement, which provided Rdio uninterrupted access to SME's library of digital content and enabled Rdio to deliver millions of additional streams to its customers, even though Rdio had not paid the Minimum Revenue Guarantee that it owed SME.

(d)     On September 30, 2015, SME and Rdio executed the 2015 Renewal Amendment.

(e)     Upon information and belief, and unbeknowst to SME, at the same time that Rdio was negotiating the 2015 Renewal Agreement with SME, Rdio was also negotiating with Pandora, which expressed an interest in June 2015 or earlier in purchasing Rdio's assets through a bankruptcy sale.  Throughout this period, Rdio fraudulently misrepresented to SME that it intended to meet its minimum revenue guarantee obligations to SME, even though it was negotiating a sale agreement to be implemented in bankruptcy which it knew would render Rdio unable to meet its obligations under the 2015 Renewal Agreement.  SME relied on these misrepresentations in agreeing to extend the Content Agreement while the parties negotiated.

(f)     Rdio's planned bankruptcy would have been a material consideration for SME in deciding whether to continue extending the Content Agreement or enforce its contractual rights.  Indeed, Rdio fraudulently concealed this fact from SME precisely because it knew that disclosure of the truth could result in termination of Rdio's access to SME's catalog, which would have damaged the value of Rdio and jeopardized reaching a deal with Pandora.

(g)     Also unbeknownst to SME at the time, by the time the parties executed the 2015 Renewal Amendment on September 30, 2015, Pandora and Rdio had *already* executed a letter of intent formalizing the plan for Pandora's acquisition of Rdio's assets through the bankruptcy sale. The 2015 Renewal Agreement obligated Rdio to remit to SME a prepayment of $2 million on October 1, 2015. Because of its preexisting agreement with Pandora, Rdio could not have intended to make that payment. Even at the time Rdio entered into the 2015 Renewal Amendment, it knew that it did not intend to perform.

(h)     The existence of the letter of intent between Pandora and Rdio would have been a material consideration for SME in deciding whether to enter into the 2015 Renewal Amendment. SME obviously would not have entered into the 2015 Renewal Amendment if it knew that Rdio had no intention to perform, and indeed was contractually committed not to perform. Rdio knowingly and fraudulently failed to disclose the letter of intent, in order to induce SME to enter into the 2015 Renewal Agreement, preserve Rdio's uninterrupted access to SME's catalogue of digital content, and enable Rdio to pursue its deal with Pandora.

(i)     On September 30, 2015—immediately following execution of the 2015 Renewal Amendment—Rdio requested a one-month extension of the prepayment deadline. Rdio falsely represented to SME that it was on the verge of signing new agreements to raise capital out of which the $2 million would be paid, and that it likely would be able to pay the $2 million prepayment by October 28, 2015, and in any event no later than November 1, 2015. These representations were knowingly false; again, unbeknownst to SME, Rdio had already signed a letter of intent with Pandora pursuant to which Rdio would file for bankruptcy. SME granted Rdio the extension in reliance on these false representations, again ensuring Rdio the

uninterrupted access to SME's digital content that was necessary in order for Rdio to finalize its deal with Pandora.

        (j)     SME did not learn about Rdio's planned bankruptcy until Rdio filed for Chapter 11 relief on November 16, 2015.

        (k)     SME was damaged as the result of its reasonable reliance on Rdio's knowing and material misrepresentations and omissions. Rdio never paid SME the $5.5 million Minimum Revenue Guarantee, nor did it pay the $2 million prepayment under the 2015 Renewal Agreement, nor did it pay anything at all to SME for use of SME's content in August, September, or October 2015 (SME received limited amounts for the use of its content in November and December 2015), even though its users continued to stream recordings owned by SME. SME would neither have continued to extend the Content Agreement, nor signed the 2015 Renewal Amendment, had it known about Rdio's negotiations with Pandora. SME would have cut off negotiations and enforced its existing contractual rights.

        (l)     Rdio, however, was enriched by its material misrepresentations and omissions. It maintained uninterrupted distribution rights to millions of SME-owned recordings, which was critical to its business. Had Rdio lost the rights to distribute SME content, its business would have collapsed and its contemplated deal with Pandora would never have been finalized.

        (m)     Rdio was unjustly enriched at SME's expense for the reasons described in paragraphs 5(a)-(l), *supra*. It would be against equity and good conscience to permit Rdio to retain the benefits described above.

        6.     <u>Supporting Documents</u>. The Claim is based upon the Content Agreement, the 2015 Renewal Amendment, and the Termination Notice described in Paragraph 4 above.

The Content Agreement is lengthy and contains confidential and proprietary information. Accordingly, redacted copies of the Content Agreement (without exhibits) and the 2015 Renewal Amendment are attached as Exhibit A and Exhibit B, respectively. A copy of the Termination Notice is attached as Exhibit C. The Claimant believes that the Debtor has a complete copy of the Content Agreement and all amendments thereto, including the 2015 Renewal Amendment. Complete copies of the Content Agreement and the amendments thereto are available upon request from the Claimant's counsel.

       7.      Judgment. No judgment has been rendered on the Claim.

       8.      Credits. The amount of all pre and post-petition payments on the Claim have been credited and deducted for the purposes of filing this proof of claim.

       9.      Setoff. The Claim is not subject to any setoff or counterclaim.

       10.      Notices. All payments and notices to the Claimant concerning the Claim should be sent to:

> Sony Music Entertainment
> 25 Madison Avenue
> New York, New York 10010
> Attention:    Susan Meisel, Esq.
>                 Alison Dow, Esq.

Copies of all notices to the Claimant concerning the Claim should be sent to:

> Luskin, Stern & Eisler LLP
> Eleven Times Square
> New York, New York 10036
> Attention:    Richard Stern, Esq.
>                 Stephan E. Hornung, Esq.

       11.      Protective Filing/Amendments. This proof of claim is filed under compulsion of the Bar Date Notice entered in this case, and is filed to protect the Claimant from forfeiture of the Claim. The execution and filing of this proof of claim are not (i) a waiver or release of any of the Claimant's rights against any entity or person liable for all or part of the

Claim, (ii) a waiver or release of the Claimant's rights under the Bar Date Notice, (iii) a consent by the Claimant to the jurisdiction of the Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant, (iv) a waiver of the Claimant's right to move to withdraw the reference or otherwise object to the jurisdiction of this Court with respect to the subject matter of the Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Claimant, (v) an election of remedy which waives or otherwise affects any other remedy, or (vi) a waiver or release of any of the Claimant's rights against any third party.

             12.    <u>Reservation of Rights</u>.  The Claimant expressly reserves its rights (i) to file any separate proof of claim with respect to the Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supersede this proof of claim), (ii) to amend or supplement this proof of claim in any respect, and (iii) to file additional proofs of claim against the Debtor or any of its affiliates for claims not covered by this proof of claim.

## Schedule A

| Fee Due | Amount |
|---|---:|
| March 2015 Unrecouped Balance | $4,917,404.00 |
| Year 1 Guarantee | $3,000,000.00 |
| October 2015 Unlimited Free Offering Fee | $750,000.00 |
| November 2015 Unlimited Free Offering Fee | $750,000.00 |
| Year 2 Guarantee | $4,000,000.00 |
| **Subtotal** | **$13,417,404.00** |
| Less Payments Received | -$998,090.00 |
| **Total Amount Due** | **$12,419,314.00** |

# EXHIBIT A

As of May 28, 2010 (the "<u>Effective Date</u>")

Rdio, Inc.
62 First Street, Suite 500
San Francisco, CA 94105

**Re: <u>Rdio, Inc./Content Distribution Agreement</u>**

This letter agreement together with the term sheet (the "<u>Term Sheet</u>") and any schedules attached hereto, which are incorporated herein by reference, will constitute the entire agreement between SONY MUSIC ENTERTAINMENT ("<u>SME</u>") and Rdio, Inc. ("<u>Company</u>" or "<u>Rdio</u>") regarding, <u>inter alia</u>, the exploitation of audio recordings embodying the performances of various musical recording artists via Company's online and mobile music subscription service, as owned, controlled and operated by Company (the "<u>Agreement</u>"). Any terms used in this Agreement but not defined herein will have the meanings ascribed to them in the Term Sheet. Unless expressly provided to the contrary herein, to the extent that any provision of this Agreement conflicts with any provision of the Term Sheet, the provisions set forth in the Term Sheet shall govern and control.

**A.**     <u>Download Agreement</u>.



ID: 264319 v 16
5/27/10

**1**

LAKAM [NT 10 -64.3(1)]

**Redacted Pages 2 through 5**



## 5. **Termination:**

(a)    (1)    Upon the occurrence of any Default Event, in addition to any other rights and remedies which SME has under this Agreement or otherwise, SME may terminate the Term upon notice to Company, following any applicable cure period set out below. No exercise of any right or remedy hereunder will limit SME's right to recover damages by reason of Company's default, SME's right to exercise any other right or remedy under this paragraph, or any of SME's other rights or remedies. Notwithstanding the foregoing or anything elsewhere herein, if the Default Event arises by reason, alone, of a "change of control" pursuant to clause (viii) of paragraph 5(a)(2) below, SME's sole remedy shall be termination of the Term of the Agreement by notice to Company.

(2)    "Default Event" means: (i) Company's failure to timely make payments required hereunder or render reports or accountings as and when due or cooperate or render any information or documents required to be furnished or otherwise made available to SME as and when required hereunder; provided, however, that, with respect to any such breach which is non-repetitive, Company shall have a period of fifteen (15) business days from its receipt of SME's notice of such breach in which to cure said breach before it shall be considered a "Default Event"; (ii) Company's breach of any of Company's representations, warranties, covenants or obligations hereunder, or

6

264319 v16
05/20/10

LK/NM [NT 10-64.3(1)]

Company's failure to fulfill any of Company's material obligations hereunder; provided, however, that, with respect to any such breach in respect of which a shorter cure period is not expressly provided herein, and provided that the breach concerned is non-repetitive, Company shall have a period of fifteen (15) business days from the date of SME's notice of such breach in which to cure said breach before it shall be considered a "Default Event"; (iii) Company's bankruptcy or insolvency, or the dissolution or the liquidation of Company's assets, or the filing of a petition in bankruptcy or insolvency for an arrangement or reorganization by, for or against Company, or the appointment of a receiver or a trustee for all or a portion of Company's property, or Company's making an assignment for the benefit of creditors; provided, however, that Company shall have a period of sixty (60) consecutive days from its receipt of any involuntary petition in bankruptcy filed against Company in which to cure said breach before it shall be considered a "Default Event"; (iv) Company's attempt to assign any of Company's rights under this Agreement in contravention of this Agreement without SME's prior written consent, or the succession of any of those rights to any other person or entity by operation of law; (v) If as a result of Company's acts or omissions any person or entity obtains access to the SME Materials in contravention of the terms, limitations and eligibility criteria regarding access thereto prescribed in the Term Sheet; (vi) If for any reason Company ceases doing business in the ordinary course and/or there is a substantial diminution in the ability of Company to effectively carry on its business in general or any aspect thereof, or in particular the business of distributing SME Materials and/or the other products referred to in this Agreement; (vii) in the event of a Default Event (as defined in the Download Agreement) under the Download Agreement; and/or (viii) In the event of a Change of Control of Company, where such control passes to an entity: (aa) that is a direct competitor of SME, (bb) with whom SME is involved in a then-current litigation, (cc) that operates or supports a service facilitating infringing activity in relation to SME's or other parties' content and exclusive rights thereto, (dd) is failing, in a material manner, to comply with applicable laws, (ee) with whom conduct of business on the terms set out in this Agreement would raise a regulatory issue, or (ff) which SME has objectively reasonable grounds to believe lacks the resources to meet the financial obligations imposed on Company hereunder.

      (b)    Upon termination or earlier expiration of the Term: (1) all rights granted to Company herein will immediately terminate, and Company will not thereafter have any right to make any use of any SME Materials or any other materials provided by SME to Company; (2) Company will immediately return, delete or destroy all materials furnished or selected by SME for use by Company, including all SME Materials and any phonorecords or copies derived therefrom in any and all forms, formats and media, as SME will direct in SME's sole discretion; (3) Company will immediately remove all links to web sites or other properties owned or controlled by SME; and (4) all monies then due or to become due to SME will become immediately due and payable.

      (c)    The following provisions shall survive the termination or expiration of the Term: 1, 2(c), 3, 4, 6(d), 10, 13(d), 14, 15(e).



Case 1:16-cv-03345 Doc #: 54-1 Filed: 05/09/16 Entered: 05/09/16 12:59:17 Page 52 of 101
101



(d)   (1)   Company will at all times indemnify and hold harmless the SME and its Affiliates and each of their respective officers, agents, employees, directors, and advisors (collectively, the "SME Indemnified Parties") from and against any and all claims asserted by a third party against any of the SME Indemnified Parties for damages, liabilities, costs and expenses (including court expenses and reasonable counsel fees) arising out of (x) any breach or alleged breach by Company of any representation, warranty, covenant or agreement made by Company herein, (y) the distribution or operation of the Subscription Service, or (z) any allegation that any materials used or exploited by or on behalf of Company in connection with the Subscription Service (except for SME Materials or any

8

Case 15-01145 Doc 54-1 Filed 05/09/16 Entered 05/09/16 12:59:17 Page 53 of 81
101

other materials substantially in the form provided to Company by SME for use in connection with this Agreement and where Company's use thereof is authorized hereunder but including, without limitation, use of any content licensed from third parties), in whole or in part, directly or indirectly, infringe upon, misappropriate or otherwise violate the rights of any third party (the "Company Claims"). Nothing contained in clause (z) of the preceding sentence shall be deemed to limit the applicability of Company's indemnification obligations, which, for the avoidance of doubt, shall apply with full force and effect regardless of the state of Company's knowledge concerning the infringement or violation of any such proprietary or intellectual property rights of any such third party. In the event of any Company Claim: (i) the applicable SME Indemnified Party shall notify Company of the Company Claim concerned immediately following the date that such SME Indemnified Party becomes aware of it (provided that such failure to immediately notify Company shall not affect any SME Indemnified Party's right to indemnification hereunder if such delay did not materially prejudice the defense of such claim); (ii) Company shall defend against the Company Claim concerned (at Company's own expense) through legal counsel selected by Company; and (iii) each party shall reasonably cooperate with the other in the defense of the Company Claim concerned. Company shall be solely responsible for the amount of any settlement or judgment for such Company Claim and all legal expenses and counsel fees incurred by Company in connection therewith; provided, however, that any settlement acknowledging any wrongdoing on behalf of any of the SME Indemnified Parties or creating any additional obligations or payments or potential liabilities for any of the SME Indemnified Parties shall be subject to the written approval of such SME Indemnified Parties. The applicable SME Indemnified Parties shall have the right at all times to actively participate in the defense thereof, and to employ legal counsel selected by such SME Indemnified Parties at their own expense, it being understood that Company shall have the right at all times, in Company's sole discretion, to maintain control of the conduct of the defense.

(2)     SME will at all times indemnify and hold harmless the Company Parties and their Affiliates and each of their respective officers, agents, employees, directors, and advisors (collectively, the "Company Indemnified Parties") from and against any and all claims asserted by a third party against any of the Company Indemnified Parties for damages, liabilities, costs and expenses (including court expenses and reasonable counsel fees) arising out of (x) any breach or alleged breach by SME of any representation, warranty, covenant or agreement made by SME herein, or (y) any claims that items of SME Materials (excluding any copyrighted musical compositions embodied therein in respect of which the acquisition, administration and financial for required licenses is Company's responsibility under the Agreement, whether pursuant to paragraph 4(b)(v) above or otherwise) exploited by Company in accordance with the terms, conditions and limitations prescribed elsewhere in this Agreement, infringe upon misappropriate or otherwise violate the rights of any third party (the "SME Claims"). In the event of any SME Claim: (i) the applicable Company Party shall notify SME of the SME Claim concerned immediately following the date that such Company Party becomes aware of it (provided that such failure to immediately notify SME shall not affect any Company Indemnified Party's right to indemnification hereunder if such delay did not materially prejudice the defense of such claim); (ii) SME shall defend against the SME Claim concerned (at SME's own expense) through legal counsel selected by SME; and (iii) each party shall reasonably cooperate with the other in the defense of the SME Claim concerned. SME shall be solely responsible for the amount of any settlement or judgment for such SME Claim and all legal expenses and counsel fees incurred by SME in connection therewith; provided, however, that any settlement acknowledging any wrongdoing on behalf of any of the Company Parties or creating any additional obligations or payments or potential liabilities for any of the Company Parties shall be subject to the written approval of such Company Parties. The applicable Company Parties shall have the right at all times to actively participate in the defense thereof, and to employ legal counsel selected by such Company Parties at their own expense, it being understood that SME shall have the right at all times, in SME's sole discretion, to maintain control of the conduct of the defense.

9

264319 v16
05/20/10

(e)    Except with respect to the parties' respective indemnification obligations pursuant to Section 8(d), neither party to this Agreement shall be liable to the other under or in connection with this Agreement whether in contract, tort (including negligence), misrepresentation (other than where made fraudulently), breach of statutory duty or otherwise for any indirect or consequential loss whatsoever incurred by either party whether or not the party was advised in advance of the possibility of any such loss. Nothing in this Agreement shall restrict or limit the liability of either party for fraud or fraudulent misrepresentation or death or personal injury caused by negligence.

(f)    No amendment to this Agreement shall be binding upon SME unless it is made by an instrument signed by an authorized officer of SME. A waiver by either party of any provision of this Agreement in any instance will not be deemed a waiver of such provision, or any other provision hereof, as to any future instance or occurrence. All remedies, rights, undertakings, and obligations contained in this Agreement will be cumulative and none of them will be in limitation of any other remedy, right, undertaking, or obligation of either party. If any part of this Agreement, or the application thereof to any party, will be adjudged by a court of competent jurisdiction to be invalid, such judgment will not affect the remainder of this Agreement, which will continue in full force and effect, or the application of this Agreement to the remaining parties.

(g)    SME shall be responsible for ensuring SME's Affiliates provide the SME Materials required pursuant to Section 6 of the Term Sheet (solely to the extent not provided centrally by SME) and otherwise reasonably co-operate with Company to the extent such co-operation may be required in order to give effect to the spirit of this Agreement.

Very truly yours,

SONY MUSIC ENTERTAINMENT

By: _____

Executive Vice President
Head of Business & Legal Affairs
Global Digital Business
Sony Music Entertainment

ACCEPTED AND AGREED:

RDIO, INC.

By: _____

10

Case 15-30305   Doc#54-1 Filed 05/09/16 Entered 05/09/16 12:59:17 Page 55 of 81
101

# EXHIBIT B

**SONY MUSIC ENTERTAINMENT**
550 Madison Avenue
New York, New York 10022-3211


Dated as of April 1, 2015
(the "2015 Renewal Amendment Effective Date")

Rdio, Inc.
1550 Bryant St., Ste. 220
San Francisco, CA 94103


Re: Rdio, Inc. – Agreement Renewal

Reference is hereby made to the agreement dated as of May 26, 2010 [NT 10-64.3(1)] between Rdio, Inc. ("Company"), on the one hand, and Sony Music Entertainment ("SME"), on the other hand, in connection with, inter alia, the distribution and exploitation of content owned or controlled by SME by Company through Company's online and mobile music subscription service, as amended, modified or otherwise supplemented to date (the "Content Agreement"). Without limiting the generality of the foregoing, reference is also specifically made to the amendment to the Content Agreement between SME and Company effective as of January 1, 2013 (the "January 2013 Amendment"), and the amendment to the Content Agreement between SME and Company effective as of September 1, 2014 (the "September 2014 Amendment").

This letter agreement, together with the summary of amended terms attached hereto as Appendix A (collectively, the "2015 Renewal Amendment"), when executed by Company and by SME, will modify the Content Agreement effective as of the 2015 Renewal Amendment Effective Date. Unless otherwise specified, terms used but not defined shall have the meanings assigned to them in the Content Agreement.

Following the full execution of this 2015 Renewal Amendment, the parties hereby agree to negotiate in good faith as expeditiously as is reasonably practicable, with a view toward having a finalized and fully executed document by March 31, 2016, with respect to an amended and restated agreement that will incorporate the terms, conditions and limitations prescribed in the Content Agreement and subsequent amendments (including this 2015 Renewal Amendment), and will include, for the avoidance of doubt, necessary conforming and technical changes to the terms set forth in the Agreement as the parties may deem necessary and appropriate in order to effectuate and implement the incorporation of the amended terms agreed upon by the parties, and which amended and restated agreement shall supersede the Agreement (the "Amended and Restated Agreement"); provided, however, unless and until the parties enter into such Amended and Restated Agreement, the Content Agreement, as amended (including by this 2015 Renewal Amendment) shall remain in full force and effect for the duration of the Term, unless sooner terminated pursuant to the Content Agreement.

287039.6

1

NT [AD 15-82]

Except as otherwise expressly modified herein, the Content Agreement shall continue unchanged and shall remain in full force and effect. This 2015 Renewal Amendment may be executed in one or more counterparts, each of which when taken together, will be deemed to constitute one and the same instrument.

Very truly yours,

SONY MUSIC ENTERTAINMENT

By: _____
Name:
Title:
Date:

SONY MUSIC ENTERTAINMENT (BRASIL)
LTDA. (solely with respect to the terms,
conditions, authorizations and obligations herein
as they pertain to Brazil)

By: _____
Name: NADIA' NOVAES BOECHAT DOS SANTOS/ WILSON VIEIRA
Title: LEGAL & BUSINESS AFFAIRS DIRECTOR / VP FINANCE AND OPERATIONS
Date: OCTOBER, O2 nd 2015          CANTOS

ACCEPTED AND AGREED:

RDIO, INC.

By: _____
Name: Anthony Bay
Title: CEO
Date:

RDIO MUSIC (BRAZIL) LTDA.
(solely with respect to the terms,
conditions, authorizations and obligations
herein as they pertain to Brazil)

By: _____          Elias da Silveira Cerqueira
Name:                                 CPF: 545.861.607-30
Title:                                CRC RJ053136 O-2 T-SP
Date:

287039.6                          3                          NT [AD 15-82]

**Appendix A**

**Summary of Amendments**

| Term | The Term will be extended for two (2) years, from April 1, 2015 through March 31, 2017. "Year 1" of the renewal term is April 1, 2015 – March 31, 2016, and "Year 2" of the renewal term is April 1, 2016 – March 31, 2017. |
|---|---|
| **Minimum Guarantee** | The entire remaining Minimum Revenue Guarantee balance under the January 2013 Amendment (effective as of March 31, 2015, including amounts payable in respect of the March 2015 accounting period) (the "March 2015 Unrecouped Balance") will "roll forward" and be added to the minimum revenue guarantee hereunder for Year 1. Accordingly, such minimum revenue guarantee for Year 1 will be equal to the sum of $3M plus the March 2015 Unrecouped Balance (such sum, the "Year 1 Guarantee").

The Year 1 Guarantee will be payable as follows:

- Monthly service fees in respect of Year 1 will be payable on a monthly basis, per the standard agreement terms.

- In addition, on or before October 1, 2015, Company will make a $2M prepayment to be credited against the Year 1 Guarantee, subject to the following:

    o the payment of such $2M amount will be waived if Company pays SME $5.5M (or more) in total monthly service fees in respect of Year 1 prior to October 1, 2015; and

    o following the payment of such $2M, Company will continue making monthly service fee payments per the standard agreement terms, but if at any time the total amount of service fees payable by Company to SME in respect of Year 1 exceeds the amount of the Year 1 Guarantee minus $2M, then the previously paid $2M prepayment will be treated as an advance recoupable on a prospective basis from any additional monthly service fees payable solely in respect of Year 1. For example, if the total amount of the Year 1 Guarantee is $7.5M, then once Company has paid SME the $2M prepayment plus $5.5M in monthly service fees for Year 1, the $2M prepayment would be an advance recoupable from any additional service fees payable thereafter in respect of Year 1.

- Any remaining balance of the Year 1 Guarantee (i.e., the amount of the Year 1 Guarantee less the $2M prepayment and all service fees payable in respect of Year 1) will be paid as a true-up payment together with the submission of reporting and service fee payments for the March 2016 accounting period.

The minimum revenue guarantee for Year 2 will be $4M (the "Year 2 Guarantee"). Any remaining balance of the Year 2 Guarantee (i.e., the amount of the Year 2 Guarantee less all service fees payable in respect of Year 2) will be paid as a true-up payment together with the submission of reporting and service fee payments for the March 2017 accounting period.

Notwithstanding the foregoing, if the Limited Free Offering and Unlimited Free Offering are not fully removed from all territories before October 1, 2015, then the |



287039.6     3     NT [AD 15-82]

amount of the Year 1 Guarantee will be increased by $750,000 for each calendar month after September 2015 (i.e., not including September 2015 or any previous calendar month) in which these offerings are still in effect during Year 1 (to a maximum of $4.5M extra for Year 1), and the amount of the Year 2 Guarantee will be increased by $437,500 for each month these offerings are still in effect during Year 2 (to a maximum of $5.25M extra for Year 2).

287039.6

4

NT [AD 15-82]

**Redacted Pages 5 through 8**



| Change of Control | Section 5(a)(2) of the letter agreement portion of the Content Agreement is hereby deleted in its entirety and replaced with the following:

"(2)     "Default Event" means: (i) Company's failure to timely make payments required hereunder or render reports or accountings as and when due or Company's failure to deliver Monthly Reports (excluding the information required pursuant to (x) Section 5 of the March 2011 Amendment (as amended by this January 2013 Amendment) and (y) Section 15(e) of this January 2013 Amendment)) as and when due; provided, however, that, with respect to any such breach, Company shall have a period of thirty (30) calendar days from its receipt of SMB's notice of such breach in which to cure said breach before it shall be considered a "Default Event"; (ii) Company's breach of any of Company's material representations, warranties, covenants or obligations hereunder, or Company's failure to fulfill any of Company's material obligations hereunder; provided, however, that, with respect to any such breach in respect of which a shorter cure period is not expressly provided herein, Company shall have a period of thirty (30) calendar days from the date of SMB's notice of such breach in which to cure said breach before it shall be considered a "Default Event"; (iii) Company's bankruptcy or insolvency, or the dissolution or the liquidation of Company's assets, or the filing of a petition in bankruptcy or insolvency for an arrangement or reorganization by, for or against Company, or the appointment of a receiver or a trustee for all or a portion of Company's property, or Company's making an assignment for the benefit of creditors; provided, however, that Company shall |

Case 15-10304-05   Doc #54-1 Filed 05/09/16   Entered 05/09/16 12:59:17   Page 62 of 101

have a period of sixty (60) consecutive days from its receipt of any involuntary petition in bankruptcy filed against Company in which to cure said breach before it shall be considered a "Default Event"; (iv) Company's attempt to assign any of Company's rights under this Agreement in contravention of this Agreement without SME's prior written consent, or the succession of any of those rights to any other person or entity by operation of law; (v) If a suspension period for a Server Security Breach, Approved Format Security Breach or Device Security Breach under paragraphs 11(b), 11(c) or 11(d) of the Term Sheet lasts for more than sixty (60) consecutive days, or ninety (90) days in any period of one hundred and eighty (180) consecutive days; (vi) If for any reason Company ceases doing business in the ordinary course and/or there is a substantial diminution in the ability of Company to effectively carry on its business in general or any aspect thereof, or in particular the business of distributing SME Materials and/or the other products referred to in this Agreement; (vii) In the event of (x) a Default Event (as defined in the Download Agreement) under the Download Agreement, (y) SME's termination of the Ex US Download Agreement pursuant to Paragraph 11 of the Ex US Download Agreement or (z) SME's termination of the Brazil Download Agreement pursuant to Paragraph 11 of the Brazil Download Agreement; (viii) In the event of a Change of Control of Company; and/or (ix) If Company launches a Locker Service without SME's prior written consent. "Locker Service" means any service, feature set or functionality that enables, induces and/or facilitates the remote storage and/or access to digital files of any kind, whether or not they embody copyrighted materials, including without limitation sound recordings, audiovisual works, pictorial or graphical works, or textual materials, and whether or not based upon or arising out of materials possessed by the end user or otherwise, and regardless of whether matched based upon fingerprinting or other content identification technologies or techniques or digital data actually uploaded by end users, whether directly or indirectly, in whole or in part. Notwithstanding the foregoing, or anything to the contrary provided herein, Company shall have a period of ten (10) days from the date of SME's notice of such default in which to cure such default event before it shall be considered a "Default Event" hereunder."

If SME terminates the Agreement because of a Change of Control, the minimum revenue guarantee(s) otherwise due and payable to SME shall be proportionately reduced based on the number of months remaining in the Term. By way of example, if SME terminates the Agreement in month 8 of Year 1, then the Year 1 Guarantee shall be 8/12ths of the total Year 1 Guarantee, and there will be no Year 2 Guarantee. Notwithstanding the foregoing, if SME terminates the Agreement due to any other type of Default Event, the full amount of the Year 1 Guarantee and the Year 2 Guarantee will become immediately due and payable to SME.

Case 1:15-cv-03462-AKH-JCF Doc #54-1 Filed 05/09/16 Entered 05/09/16 12:59:17 Page 63 of 101

# EXHIBIT C

**SONY MUSIC ENTERTAINMENT**
550 Madison Avenue
New York, New York 10022-3211

November 16, 2015

Rdio, Inc.
1550 Bryant St., Ste. 220
San Francisco, CA 94103
Attn: President

Re: <u>Rdio, Inc. – Agreement Termination</u>

Reference is hereby made to the agreement dated as of May 28, 2010 [NT 10-64.3(1)] between Rdio, Inc. ("<u>Rdio</u>"), on the one hand, and Sony Music Entertainment ("<u>SME</u>"), on the other hand, in connection with, <u>inter alia</u>, the distribution and exploitation of content owned or controlled by SME through Rdio's online and mobile music subscription service, as amended, modified or otherwise supplemented to date (the "<u>Content Agreement</u>").

Please be advised that SME hereby terminates the Content Agreement with immediate effect in accordance with Sections 5(a)(1), 5(a)(2)(iii) and 5(a)(2)(iv) of the Content Agreement because of Rdio's insolvency and Rdio's attempt to assign its rights under the Content Agreement without SME's prior written consent. SME hereby specifically withholds its approval of any assignment of the Content Agreement in accordance with paragraph 6(c) of the Content Agreement.

The foregoing is not intended as a full statement of the facts in this matter. This letter is sent without prejudice to any of SME's right and remedies under the Content Agreement, all of which are expressly reserved.

Sincerely,

L. Jeff Walker
EVP, Business & Legal Affairs
Global Digital Business

288660.1

**EXHIBIT "2"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
                  :

SONY MUSIC ENTERTAINMENT,     :    Case No.: 16 Civ. _____
                  :
          Plaintiff,    :    **COMPLAINT**
                  :
          v.      :    **ECF CASE**
                  :
ANTHONY BAY, ELLIOTT PETERS, and JIM  :    <u>**JURY TRIAL DEMANDED**</u>
RONDINELLI,               :
                  :
          Defendants.   :
-------------------------------------------------------------x

       Plaintiff Sony Music Entertainment ("SME" or "Plaintiff"), by its undersigned

attorneys, brings this lawsuit against Defendants Anthony Bay, Elliott Peters, and Jim Rondinelli

(collectively, "Defendants," and each a "Defendant"), and alleges as follows:

<u>**NATURE OF THE ACTION**</u>

      1.    This action concerns a fraud planned and perpetuated by Defendants

against Sony Music Entertainment over an approximately yearlong period in 2014 and 2015.

      2.    SME's business is focused on producing, manufacturing, distributing,

selling, licensing, and otherwise exploiting audio and audiovisual recordings throughout the

world.  Its well-known and respected music labels—which include Columbia, RCA, Epic, Sony

Nashville, Legacy, and Sony Masterworks, among others—are home to some of the most

popular and successful recording artists of all-time, including Michael Jackson, Bob Dylan,

Bruce Springsteen, Beyoncé, Pharrell Williams, Adele, and Miles Davis, to name just a few.

SME is the second-largest recorded music company in the world.

      3.    Defendants are former directors, officers, and/or employees of Rdio, Inc.

("Rdio"), a defunct online music streaming service.

4.      Rdio's music streaming business operated from 2010 until December 22, 2015, when the United States Bankruptcy Court for the Northern District of California approved the sale of Rdio assets to Pandora Internet Radio ("Pandora"), pursuant to an agreement that had been executed the previous month.  Rdio and Pandora had been working together towards this bankruptcy sale since June 2015 or earlier.

5.      Prior to December 22, 2015, defendant Bay was Rdio's CEO, defendant Peters was Rdio's Vice President and General Counsel, and defendant Rondinelli was Rdio's Senior Vice President.  Upon information and belief, Peters remains Rdio's General Counsel, and Bay and Rondinelli are no longer employed by Rdio.

6.      Defendant Bay was—and upon information and belief still is—also an owner, executive officer, and director of Pulser Media, Inc., which owned 79% of Rdio and held 98% of the secured debt issued by Rdio.  Thus, in the event of an Rdio bankruptcy, Pulser and Bay expected to be first in line to recover whatever value remained in Rdio.

7.      Until it ceased operations, Rdio offered its consumers the ability to stream more than 20 million songs on their computers and mobile devices.  Many of these recordings were owned or controlled by SME, which in 2010 entered into an agreement with Rdio that permitted Rdio to distribute SME's content (the "Content Agreement").

8.      Between October 2014 and September 2015, SME and Rdio negotiated the terms of an amendment to the Content Agreement.  Rdio was represented by Defendants in these negotiations, typically by Peters and Rondinelli, but also at times by Bay.

9.      While those negotiations were ongoing, SME entered into a series of interim extensions of the Content Agreement.  These extensions provided Rdio continued access

2

to SME's sound recordings, and also allowed Rdio to avoid paying $5.5 million that originally was due to SME by December 31, 2014.  Rdio's service was not sustainable without access to SME's large and valuable catalog of popular recordings; indeed, Rdio acknowledged in the bankruptcy that its content licensing agreements with SME and other owners of sound recordings were among its "primary assets."  A loss of access to SME's content would have been devastating to Rdio's business, and would have led many of its key employees—including Rdio's team of skilled, mobile software engineers—to leave the company for other opportunities. That would have diminished the value of Rdio's business to Pandora, which was interested largely in acquiring these employees' contracts, and would have put at risk Defendants' jobs and the ability of Pulser and Bay to recover their investments.

10.     Unbeknownst to SME, however, at the same time that Rdio was negotiating the amendment to its Content Agreement with SME, it was simultaneously negotiating its deal with Pandora—under which Rdio would file for bankruptcy; Pandora would buy Rdio's assets out of bankruptcy; defendant Bay (as part-owner, executive officer, and director of Rdio's secured creditor) would expect to be first in line to receive proceeds of the Pandora deal; and SME (as an unsecured creditor) would receive pennies on the dollar for the amounts owed to it under the amended Content Agreement.

11.     Defendants knew that, had SME learned about Rdio's negotiations with Pandora at any time during the negotiations to amend the Content Agreement, SME would have demanded immediate payment of the $5.5 million that Rdio owed to SME, and would have refused to grant Rdio further access to the recordings owned by SME.  That in turn would have substantially diminished Rdio's business and jeopardized the secret proposed sale to Pandora.

12.     In order to induce SME to continue to provide Rdio with the rights to SME's catalog, Defendants continued to negotiate the terms of an amendment to the Content Agreement—exchanging term sheets that contemplated payments by Rdio over a period of years—while concealing from SME the fact that Rdio was negotiating an agreement with Pandora that Defendants knew would render Rdio unable to meet these obligations to SME.

13.     Bay ultimately signed the amendment to the Content Agreement on Rdio's behalf on September 30, 2015 (the "Renewal Amendment").  Under the Renewal Amendment, SME agreed to license to Rdio the use of the sound recordings owned or controlled by SME, in exchange for which Rdio agreed to pay SME millions of dollars through March 31, 2017.

14.     Unbeknownst to SME at the time, Rdio had *one day earlier* signed a Letter of Intent with Pandora concerning the intended bankruptcy filing, which would prevent Rdio's performance of its obligations to SME under the Renewal Amendment.  Rdio never intended to fulfill the commitments it made in the Renewal Amendment.

15.     A material provision of the Renewal Amendment was Rdio's obligation to pay SME $2 million on October 1, 2015—the day after the Renewal Amendment was executed. This presented a dilemma for Rdio:  the Pandora deal would be jeopardized *either* upon Rdio's taking $2 million in cash out of its business, *or* upon Rdio failing to make the payment to SME and putting its ongoing access to SME's content at risk.  To escape this bind, Defendants made false statements designed to induce SME to extend the due date for the payment rather than terminate the Renewal Amendment.  Defendants Bay and Rondinelli fraudulently misrepresented to SME that Rdio was raising capital that would enable it to make this payment, when in fact Rdio was finalizing its deal with Pandora, under which Rdio would pay SME neither the $2

4

million, nor the monthly fees it owed for the rights to SME's content that Rdio continued to

exploit, nor the millions of dollars in other payments required under the Renewal Amendment.

16.     As detailed below, Rdio ultimately succeeded in hiding the Pandora deal

from SME until November 16, 2015, the date on which Rdio and Pandora signed an Asset

Purchase Agreement and Rdio filed for Chapter 11 relief.  As a result of this fraud, SME lost

millions of dollars owed to it by Rdio.

17.     Each of the Defendants was an officer or director of Rdio, and each of

them knew of and participated in the fraud on SME.  Defendants Bay and Peters were both

personally involved in Rdio's simultaneous negotiations with Pandora and SME, and knew that

Rdio's representations to SME were false.  In addition, Defendants Bay and Rondinelli

personally made fraudulent misrepresentations to SME in furtherance of the fraudulent scheme.

Defendants' fraudulent actions substantially harmed SME, and enriched the individual

Defendants by making the Pandora deal possible.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332(a), the citizenship of the parties being diverse and the matters in controversy

exceeding the amount of $75,000, exclusive of interest and costs.

19.     A substantial part of the events giving rise to this lawsuit occurred in New

York.  Accordingly, venue is proper in New York pursuant to 28 U.S.C. § 1391(b).

20.     Defendants are subject to personal jurisdiction in this Court pursuant to

CPLR § 302(a)(1), because they initiated and pursued substantial, purposeful business in New

York giving rise to this case.  Rdio could not operate a competitive streaming service without

5

access to SME's valuable library of sound recordings.  On Rdio's behalf, Defendants therefore sought out an ongoing business relationship with SME—a New York-based entity—and came to SME's New York headquarters to negotiate the terms of Rdio's contract with SME (including the Renewal Amendment) in person.  The terms of that contract, which remained unchanged in the Renewal Amendment (which Defendant Bay personally signed), provided that it was "entered into in the State of New York"; that its interpretation would "be governed by the law of the State of New York applicable to contracts entered into and performed entirely within New York"; and that "[t]he New York courts (state and federal, located in New York County), will have sole jurisdiction of any controversies regarding this Agreement."  In addition, as more fully detailed below, Defendants further projected themselves into New York by phone and email by directing their fraudulent misrepresentations and omissions to SME in New York for purposes of inducing SME to extend payment terms under the Renewal Amendment.  Upon information and belief, Rdio also maintained an office in New York City for the purpose of carrying out its ongoing relationship with New York-based music and entertainment companies, including SME.

## PARTIES

21.    Plaintiff SME is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  SME's headquarters and principal place of business are at 25 Madison Avenue, New York, New York 10010.  SME markets, sells, distributes, and otherwise exploits audio and audiovisual recordings embodying musical and/or vocal performances by recording artists.

22.    Anthony Bay is the former Chief Executive Officer of Rdio, Inc.  Upon information and belief, Mr. Bay is a resident of California.

6

23.     Elliott Peters is the General Counsel of Rdio, Inc. and also holds or held the title of Senior Vice President.  Upon information and belief, Mr. Peters is a resident of California.

24.     Jim Rondinelli is the former Senior Vice President of Rdio, Inc.  Upon information and belief, Mr. Rondinelli is a resident of California.

## FACTS ENTITLING PLAINTIFF TO RELIEF

### A.     Rdio and its Relationship with SME

25.     Rdio was founded in 2008, and its online music streaming service launched in 2010.  Rdio's streaming service was available on its website and through apps for Android, iPhone, iPad, and other devices.  At the time it ceased operations on December 22, 2015, Rdio was available in 86 countries.  For $9.99 a month, it offered consumers unlimited, on-demand, ad-free access to a library of more than 20 million songs.  It also offered consumers other service options, including a $3.99 per month subscription, and free, advertising-based streaming services.

26.     The market for online streaming services is highly competitive. Throughout its existence, Rdio competed for subscribers and listeners with other established streaming services such as Spotify, Rhapsody, and others.  Rdio sought to compete by offering what it touted as superior technology developed by a team of high caliber software engineers. Regardless of its technology, however, Rdio could not effectively compete without offering consumers a large library of streamable music, including recordings owned or controlled by SME (including recordings by the likes of Bruce Springsteen, Michael Jackson, Beyoncé, and Adele, to name just a few) and other major record companies.

7

27.     Pulser Media, Inc. owned 79% of Rdio's equity and thus controlled Rdio. Bay, in addition to serving as Rdio's CEO, was also an equity owner, executive officer, and director of Pulser Media.  Upon information and belief, Pulser Media was an entity organized solely to be the parent of Rdio.

28.     In May 2010, Rdio and SME entered into the Content Agreement, which governed the distribution and exploitation of content owned or controlled by SME through Rdio's online and mobile music subscription service.  Although the Content Agreement was modified from time to time between 2010 and 2014, the core bargain remained the same:  SME permitted Rdio to stream recordings owned or controlled by SME, and Rdio agreed to pay SME a portion of Rdio's revenue, subject to an annual "Minimum Revenue Guarantee."  The Content Agreement was signed on SME's behalf by New York-based Executive Vice President, Head of Business and Legal Affairs, Global Digital Business Group L. Jeff Walker.

29.     Under the Content Agreement, Rdio was required to pay SME a Minimum Revenue Guarantee of approximately $5.5 million by December 31, 2014.  In or around October 2014, Rdio, through Peters and Rondinelli, approached SME's New York-based employees to renegotiate its Content Agreement with SME and defer the due date for this payment.  On December 3, 2014, each of the Defendants participated in an in-person meeting at SME's headquarters in New York to discuss this proposal.

30.     After this meeting in New York, SME initially agreed to an extension of the term of the Content Agreement to March 31, 2015, and then agreed to a series of short interim extensions while a more permanent renewal amendment was negotiated.  These extensions allowed Rdio uninterrupted access to SME's library of digital content and enabled Rdio to deliver millions of additional streams to its customers, even though Rdio had not paid the

8

Minimum Revenue Guarantee that it owed SME.  Defendants Peters and Rondinelli were Rdio's

principal negotiators during this time, although Defendant Bay and others were involved at

times.  SME was represented in negotiations by New York-based employees including Andre

Stapleton, Senior Vice President, Global Business Development and Strategy, Global Digital

Business Group, and Alison Dow, Senior Director, Business and Legal Affairs, Global Digital

Business Group.  As part of these negotiations, Defendants Bay and Rondinelli participated in in-

person meetings at SME's New York headquarters on April 15, 2015, with defendant Peters

participating by phone.  The remaining negotiations took place via phone or email; the parties

never met anywhere other than in New York.

31.    On September 30, 2015, Bay executed the Renewal Amendment on Rdio's

behalf.  A material provision of the Renewal Amendment was Rdio's obligation to pay SME $2

million on October 1, 2015, the day after Bay signed the deal.  The Renewal Amendment was

executed by New York-based SME Executive Vice President L. Jeff Walker.

**B.    Rdio's Deal with Pandora**

32.    Unbeknownst to SME, at the same time that Rdio was negotiating the

Renewal Amendment with SME, Rdio was also negotiating with Pandora, which expressed an

interest in June 2015 or earlier in purchasing Rdio's assets through a bankruptcy sale.  Upon

information and belief, the key assets that Pandora was interested in acquiring from Rdio were

the employment contracts with Rdio's top software engineers.  Pandora was also interested in

technology and intellectual property.  Pandora would not, however, assume Rdio's Content

Agreement with SME.

33.    Discussions between Pandora and Rdio concerning the bankruptcy sale

lasted many months.  A declaration submitted by Peters in the Rdio bankruptcy case states that

Rdio began looking for a buyer or merger partner sometime around the fall of 2014, and Pandora emerged as the leading candidate by June 2015. Peters's declaration also admits that Pandora was interested in acquiring Rdio's assets only if it could do so through a bankruptcy.

34.     As revealed in bankruptcy filings, the vast majority of Rdio's secured debt—approximately $186 million out of $190 million, or 98%—is owned by Pulser Media. As noted above, Defendant Bay is an executive officer, director, and owner of Pulser Media. Bay thus stood to gain personally from the bankruptcy sale, as he expected to be first in line to recover the proceeds of the sale.

35.     In addition to being the predominant holder of Rdio's secured debt, Pulser Media also owns and controls almost 80% of Rdio's equity shares, and thus had control over Rdio's decision to reach a deal with Pandora and to enter bankruptcy.

36.     On July 8, 2015, Pandora presented Rdio with a preliminary Letter of Intent to proceed with a sale of Rdio's assets in bankruptcy. This was followed by further negotiations that culminated in a signed Letter of Intent between Rdio and Pandora on September 29, 2015, one day prior to Anthony Bay's signing of the Renewal Amendment with SME. In other words, Rdio and Pandora had agreed in writing to proceed with a bankruptcy sale *before* Bay executed the Renewal Amendment. Under the contemplated transaction, Pandora would not assume Rdio's Content Agreement with SME.

37.     Pandora and Rdio executed a final Asset Purchase Agreement on November 16, 2015. The Asset Purchase Agreement was signed on Rdio's behalf by Peters. Pursuant to the Agreement, Pandora agreed to purchase Rdio assets for approximately $75 million, but Pandora did not assume the SME-Rdio Content Agreement. Upon information and

10

belief, Pandora and Rdio negotiated the terms of the final Asset Purchase Agreement between September 29, 2015 and November 16, 2015.

38.     On November 16, 2015, Rdio filed for Chapter 11 relief in the United States Bankruptcy Court for the Northern District of California.  Only then did SME learn for the first time that Rdio had been planning for months to file for bankruptcy, and had been negotiating the terms of the filing with Pandora at the same time that Rdio was negotiating the Renewal Amendment with SME.

39.     The Bankruptcy Court approved the sale of Rdio assets to Pandora on December 22, 2015.  Rdio shut down its music streaming services that same day.  On December 23, 2015, Pandora issued a press release stating that it had completed its acquisition of Rdio's assets.  Pandora, according to the press release, added "nearly 100 former Rdio employees to its product, engineering and content licensing teams."  As Pandora stated in its press release, "[t]his move will accelerate Pandora's plan to substantially broaden its subscription business and roll out a multi-tier product offering by late 2016."

**C.     The Fraud**

40.     To enable its deal with Pandora, Rdio concealed the materials facts of that deal from SME, and fraudulently induced SME to extend the Content Agreement and enter into the Renewal Amendment, and to then extend the October 1, 2015 deadline by which Rdio was obligated to pay SME $2 million thereunder.  Each of Bay, Peters, and Rondinelli knew of and participated in this fraud.

41.     Defendants' course of fraudulent conduct was designed to conceal Rdio's planned bankruptcy sale to Pandora, avoid payment of revenue guarantees owed by Rdio to SME, and preserve Rdio's ability to stream SME-owned recordings until the Pandora deal was

finalized.  Defendants knew that Rdio's planned bankruptcy would have been a material consideration for SME in deciding whether to enter into the Renewal Amendment and then extend its payment terms, or to withdraw its content from Rdio and insist upon payment of the millions of dollars Rdio already owed.  But preserving Rdio's access to SME's content was critical to the continued viability of Rdio's business and, by extension, to the completion of the Pandora deal.

42.     Rdio's loss of its right to stream SME-owned content would have been devastating for its business because SME is the second-largest recording label in the world.  According to filings in the bankruptcy case, Rdio was already suffering up to $2.4 million in losses per month as of the fall of 2014.  Losing SME's content meant that Rdio was extremely unlikely to survive; its key employees would have left for competitors or other new technology companies, and the investments of Rdio's investors, including Bay, would have been lost.  This, in turn, would have jeopardized the Pandora deal, which Pandora was pursuing in large part to acquire the employment contracts for Rdio's talented team of software engineers.  Peters, in a declaration to the Bankruptcy Court, noted Rdio's team of "high caliber Silicon Valley engineering talent," and Pandora touted its acquisition of this team in its December 23, 2015 press release.  A downturn in Rdio's business would have caused these skilled, highly mobile employees to leave the company.  This, in turn, would have put Defendants' jobs at risk and ruined Defendant Bay's ability to recover his personal investment in Rdio through a sale in bankruptcy.  Upon information and belief, this also would have jeopardized substantial bonus payments to Defendants, including a payment of $213,000 to Peters in approximately December of 2015, which was revealed in Rdio bankruptcy filings.

43.     By fraudulently inducing SME to enter into the interim extensions of the Content Agreement and the Renewal Amendment, Defendants ensured that Rdio had uninterrupted access to SME's catalog of recordings and thus that Rdio's business was not disrupted before the deal was finalized.

44.     On September 29, 2015, Rdio and Pandora signed a letter of intent to proceed with a sale of Rdio's assets in bankruptcy.  One day later, on September 30, 2015, Bay executed the Renewal Amendment, which provided that Rdio was obligated to remit to SME a $2 million prepayment to SME *the very next day*, October 1, 2015.  This prepayment obligation was a key term of the Amendment and had been the subject of intense negotiations between SME and Rdio, which was principally represented in such negotiations by Peters and Rondinelli.

45.     Until SME learned of Rdio's bankruptcy filing on November 16, 2015, no one—not Bay, not Peters, not Rondinelli—disclosed the preexisting Pandora Letter of Intent to SME, even though the letter made Rdio's performance of its obligation to pay $2 million under the Renewal Amendment impossible.  Bay was personally involved in and knew about both the Rdio-Pandora negotiations (which concerned the sale of a company of which he was CEO and that was owned by another company of which he was an executive officer, director, and owner) and Rdio's negotiations with SME (which he traveled to New York to participate in personally). Peters, Rdio's General Counsel, was also directly involved in and knew about the Pandora negotiations—indeed, Peters signed the Rdio-Pandora Asset Purchase Agreement—at the same time he was negotiating the Renewal Amendment with SME.  On information and belief, Rondinelli, as a Senior Vice President of the company, also knew about the Pandora negotiations.  Yet all of them knowingly or recklessly omitted to disclose the fact of the Letter of Intent to SME, which omission rendered Rdio's agreement to pay materially misleading.

13

46.     On September 30, 2015, immediately after Bay's execution of the
Renewal Amendment, Rondinelli contacted SME's Senior Vice President Andre Stapleton in
New York.  In that conversation, Rondinelli requested a one-month extension of the $2 million
prepayment deadline from October 1, 2015 to November 1, 2015.  To induce Stapleton to agree
to the extension, Rondinelli represented that Rdio was on the verge of signing new agreements to
raise capital out of which the $2 million would be paid.  Rondinelli represented to Stapleton that
Rdio would be able to pay the $2 million prepayment by October 28, 2015, but in any event
would do so no later than November 1, 2015.

47.     SME granted Rdio the extension only after Rondinelli specifically assured
Stapleton that Rdio would pay the $2 million by November 1, 2015.  Stapleton informed
Rondinelli that he was receiving pressure from SME's finance department, and that SME would
only agree to the extension if Rdio could guarantee that the payment would be made by
November 1, 2015.  Rondinelli assured Stapleton that the funding was forthcoming, confirmed
that the money would be paid by November 1, 2015, and promised that the two men would not
be repeating the conversation a month later.  In reasonable reliance on Rondinelli's
representations, SME granted the extension to November 1, 2015, and thus ensured Rdio
continued, uninterrupted access to SME's digital content.

48.     These representations by Rondinelli were fraudulent.  Rdio was not raising
capital, as Rondinelli falsely represented, nor did Rdio plan to pay the $2 million to SME by
November 1, 2015.  Rdio was instead finalizing the agreement with Pandora to sell off its assets
in a bankruptcy proceeding, but needed continued access to SME's content to prevent the deal
from falling apart.  Upon information and belief, Rondinelli, as Senior Vice President, knew or
was reckless in not knowing that his statements on September 30, 2015 were false.  Bay and

14

Peters, both of whom knew of the pending transaction with Pandora, also knew that Rondinelli's representations to SME on behalf of Rdio were false.

49.     On or about November 1, 2015, Rondinelli contacted Stapleton in New York and stated that Rdio would not be able to make good on its promise to pay the $2 million by that date.

50.     On November 2, 2015, Bay sent an email to Dennis Kooker, SME's New York-based President, Global Digital Business & U.S. Sales.  Bay cc'd Stapleton and Rondinelli on the email.  Bay wrote to Kooker what Rondinelli had previously told Stapleton—that Rdio could not meet the November 1, 2015 deadline for the $2 million prepayment.  Bay again failed to inform Kooker that Rdio and Pandora were working towards a bankruptcy sale, even though Rdio was by then only two weeks away from its Chapter 11 filing, and Bay, as the CEO, knew this.  Instead, Bay told Kooker that Rdio simply needed more time to make the payment.  As Bay wrote, Rdio was attempting "to secure new financing," implying that the $2 million would be paid out of such financing.  Bay also reported that "the results appear promising," asking Kooker for his "continued patience as we work to resolve this situation ASAP."

51.     Again, this was fraud.  Bay, as the CEO of Rdio, knew that these statements were false; that Rdio was not securing new financing that would enable it to pay the $2 million to SME; and that Rdio was going into bankruptcy and was pursuing a sale of its assets pursuant to which SME's contract would not be assumed.  In reliance on this misrepresentation, SME agreed again to extend the payment date and to allow Rdio continued, uninterrupted access to SME's digital content, which enabled Rdio to finalize its deal with Pandora.  Had SME known the truth, it would have immediately given Rdio notice of default under the Renewal Amendment.

15

52.     Defendant Peters likewise knew of and participated in the fraud.  He was directly involved in the negotiations of both Rdio's deal with Pandora and Rdio's negotiations of the Renewal Amendment with SME.  Peters thus knew that Rdio's representations to SME that it was in the process of obtaining financing that would enable it to pay SME were false; Rdio instead was negotiating the Asset Purchase Agreement with Pandora, which he personally signed on Rdio's behalf.

53.     SME would not have continued to extend the Content Agreement on an interim basis, signed the Renewal Amendment, or agreed to extend Rdio's October 1, 2015 deadline to pay SME $2 million under the Renewal Amendment had it known that Rdio was negotiating its transaction with Pandora.  It did so only in reliance on Defendants' fraudulent misrepresentations and omissions detailed above.

54.     SME was damaged as the result of its reasonable reliance on Rdio's knowing and material misrepresentations and omissions.  Rdio never paid SME the $5.5 million Minimum Revenue Guarantee, nor did it pay the $2 million prepayment under the Renewal Amendment, nor did it pay SME the amounts it owed for use of SME's content in August, September, and October of 2015, even though Rdio's users continued to stream recordings owned by SME.  According to an Rdio bankruptcy filing, Bay personally was paid more than $135,000 between August 2015 and Rdio's filing for bankruptcy on November 16, 2015.  Bay was also paid $200,000 on May 29, 2015, and more than $66,000 in June and July of 2015.  Upon information and belief, Rdio also paid Defendants substantial cash bonuses in approximately December of 2015, including a bonus to Peters of $213,000.  Had Defendants revealed the truth to SME, SME would have acted to enforce its contractual rights to the Minimum Revenue Guarantee owed under the Content Agreement, and would not have licensed

16

its content to Rdio for August or any other subsequent month—valuable rights for which SME was never paid.

## COUNT ONE

### Fraudulent Inducement

55.      SME incorporates by reference the allegations set forth in all prior paragraphs of this Complaint as if set forth fully herein.

56.      As described above, each of the Defendants participated in or had knowledge of Rdio's fraud.  Defendants Bay and Rondinelli knowingly or recklessly made false, material misrepresentations and omissions to SME regarding Rdio's purported intention to pay SME $2 million.  Each of the Defendants had actual knowledge of these fraudulent misrepresentations.  In addition, each of the Defendants, in furtherance of the fraudulent scheme, knowingly concealed Rdio's planned bankruptcy from SME from at least June 2015 until the bankruptcy filing on November 16, 2015.  All of these actions were undertaken to induce SME to extend rights and restructure Rdio's payment obligations to preserve the Pandora deal.

57.      SME entered into the Renewal Amendment and the earlier interim extensions of the Content Agreement, and agreed to further extend Rdio's payment obligations under the Renewal Amendment, in justifiable reliance on Rdio's material misrepresentations and omissions.

58.      Through their fraudulent misrepresentations and omissions and SME's reliance thereupon, Defendants ensured Rdio's uninterrupted access to SME's catalog of digital content.  This, in turn, allowed Rdio to pursue and successfully complete its deal with Pandora, without fulfilling Rdio's payment obligations to SME.

59.     By relying on Defendants' fraudulent misrepresentations and omissions, SME suffered damages to be proven at trial.

## COUNT TWO

### Unjust enrichment

60.     SME incorporates by reference the allegations set forth in all prior paragraphs of this Complaint as if set forth fully herein.

61.     SME provided Rdio with valuable access to SME-owned recordings as a direct result of Defendants' fraud.  This enabled Rdio to continue to run its business until December 22, 2015 and finalize its sale to Pandora.

62.     Each of the Defendants was enriched by the fraud at SME's expense. Rdio never paid SME the $5.5 million Minimum Revenue Guarantee due December 31, 2014, nor did it pay the $2 million prepayment under the Renewal Amendment.  Nor did Rdio pay anything at all to SME for the use of SME's content in August, September, and October of 2015, even though Rdio's users continued to stream recordings owned by SME.  Bay, Peters, and Rondinelli were able to maintain their jobs and the concomitant salary by virtue of SME's continued provision of rights to its catalog, for which SME was never paid.  In fact, Rdio paid Bay more than $135,000 between August 1, 2015 and Rdio's filing for bankruptcy on November 16, 2015, and paid Peters a bonus of $213,000 in December 2015—money that should have been paid to SME for the rights it licensed to Rdio.  In addition, as an owner of Pulser Media, which owned 98% of Rdio's secured debt, Defendant Bay was personally enriched by the sale to Pandora.

63.     It would be against equity and good conscience to permit Defendants to retain any benefits that they obtained as a result of their fraudulent conduct.

## DEMAND FOR JURY TRIAL

SME demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, SME respectfully requests that this Court enter judgment:

  a.  Finding Defendants liable for fraud.

  b.  Finding Defendants liable for unjustly enriching themselves at SME's expense such that it would be against equity and good conscience to permit them to retain the benefits described herein.

  c.  Awarding SME compensatory, punitive, and all other damages to which it is entitled as the result of Defendants' knowing and willfully fraudulent misrepresentations and omissions.

  d.  Awarding SME prejudgment and post judgment interest.

  e.  Awarding SME the fees, costs and expenses incurred in this action, an award of attorneys' and/or experts' fees and costs; and

  f.  Granting SME such other relief as the Court deems just and proper.

New York, New York
April 4, 2016

COVINGTON & BURLING LLP


By    <u>s/ Jonathan M. Sperling</u>
        Jonathan M. Sperling
        Dianne F. Coffino
        Jonathan D. Cohen

The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
jsperling@cov.com
dcoffino@cov.com
jcohen@cov.com

*Counsel for Plaintiff Sony Music Entertainment*

**EXHIBIT "3"**

| | |
|---|---|
| Debtor 1 | Rdio, Inc. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of California |
| Case number | 15-31430 |

Official Form 410

# Proof of Claim

12/15

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Elliott Foss Peters<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Elliott Foss Peters<br>Name | Name |
| 1432 West San Carlos Street, #426<br>Number          Street | Number          Street |
| San Jose          CA          95126<br>City          State          ZIP Code | City          State          ZIP Code |
| Contact phone 917-513-1381 | Contact phone _____ |
| Contact email elliott.peters@rd.io | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____          Filed on _____<br>MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

Case 15-31430    Doc# 26-1 Filed: 05/09/16 Entered: 05/09/16 12:59:17    Page 88 of 101

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**

$_____Unliquidated_____ . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See addendum
_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.   $_____

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   3/21/2016
                   MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Elliott | Foss | Peters |
| | First name | Middle name | Last name |

Title   SVP & General Counsel

Company   Rdio, Inc.
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   1432 West San Carlos Street, #426
          Number          Street

San Jose                          CA        95126
City                              State     ZIP Code

Contact phone   95126                Email   elliott.peters@rd.io

## Addendum - Explanation of Proof of Claims

Elliott Peters (the "Claimant") is an officer of Rdio, Inc.

The Claimant asserts claims against Rdio, Inc. (the "Debtor") based on any and all of the following in order to protect Claimant's rights and preserve such claims:

- all rights and remedies under any applicable company organizational documents, including its certificate of incorporation and bylaws and other constitutive documents;
- all rights of indemnification for actions arising during the pre-petition period (i.e., prior to November 16, 2015), including attorney's fees and other related costs, under any agreement, policy or practice of Debtor or otherwise under applicable law; and
- all rights with respect to any applicable director and officer liability insurance.

The Claims asserted by the Claimant are, to the best of Claimant's knowledge, presently contingent and in an unliquidated amount. The Claimant reserves the right to amend or to supplement this Proof of Claim as additional information becomes available; to the extent any claim is asserted against the Claimant including, without limitation, any claim arising out of any acts alleged to have occurred prior to the petition date; or, as otherwise appropriate.

# EXHIBIT "4"

| | |
|---|---|
| Debtor 1 | Rdio, Inc. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of California |
| Case number | 15-31430 |

## Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

Anthony Joel Bay
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Anthony Joel Bay
Name

218 Main Street, #444
Number        Street

Kirkland              WA        98033
City              State        ZIP Code

Contact phone  (425) 881-7257

Contact email  anthony.bay@rd.io

Where should payments to the creditor be sent? (if different)

Name _____

Number        Street

City              State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____        Filed on _____
                                                                              MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | |
|---|---|
| 7. How much is the claim? | $_____ Unliquidated. **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>See addendum _____ |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br>**Amount of the claim that is secured:** $_____<br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate** (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410   Proof of Claim   page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | Amount entitled to priority |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | | $_____ |
| | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | | |

---

**Part 3:** **Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  3/21/2016
               MM / DD / YYYY

Signature  *T.P. ANTHONY BAY*

Print the name of the person who is completing and signing this claim:

| Name | Anthony | Joel | Bay |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | CEO and Director | | |
| Company | Rdio, Inc. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 218 Main Street, #444 | | |
| | Number         Street | | |
| | Kirkland | WA | 98033 |
| | City | State | ZIP Code |
| Contact phone | (425) 881-7257 | Email | anthony.bay@rd.io |

# Addendum - Explanation of Proof of Claims

Anthony Bay (the "Claimant") is CEO and Director of Rdio, Inc.

The Claimant asserts claims against Rdio, Inc. (the "Debtor") based on any and all of the following in order to protect Claimant's rights and preserve such claims:

- all rights and remedies under any applicable company organizational documents, including its certificate of incorporation and bylaws and other constitutive documents;
- all rights of indemnification for actions arising during the pre-petition period (i.e., prior to November 16, 2015), including attorney's fees and other related costs, under any agreement, policy or practice of Debtor or otherwise under applicable law; and
- all rights with respect to any applicable director and officer liability insurance.

The Claims asserted by the Claimant are, to the best of Claimant's knowledge, presently contingent and in an unliquidated amount. The Claimant reserves the right to amend or to supplement this Proof of Claim as additional information becomes available; to the extent any claim is asserted against the Claimant including, without limitation, any claim arising out of any acts alleged to have occurred prior to the petition date; or, as otherwise appropriate.

**EXHIBIT "5"**

| Sony Bankruptcy Claim Allegations | New York Action Allegations |
|---|---|
| "The Debtor fraudulently induced the Claimant to enter into the 2015 Renewal Agreement." Rider to Proof of Claim of SME Music Entertainment ("Rider") ¶ 5.a. | "To enable its deal with Pandora, Rdio concealed the material facts of that deal from SME, and fraudulently induced SME to extend the Content Agreement and enter into the Renewal Amendment[.]" NY Complaint ¶ 40. |
| "Beginning in or around October 2014, Rdio sought to renegotiate its Content Agreement with SME under which Rdio was required to pay SME a Minimum Revenue Guarantee of Approximately $5.5 million by December 31, 2014." Rider ¶ 5.b. | "Between October 2014 and September 2015, SME and Rdio negotiated the terms of an amendment to the Content Agreement." NY Complaint ¶ 8. "Under the Content Agreement, Rdio was required to pay SME a Minimum Revenue Guarantee of approximately $5.5 million by December 31, 2014." NY Complaint at ¶ 29. |
| "SME initially agreed to an extension of the term of the Content Agreement to March 31, 2015, and then agreed to a series of extensions of the Content Agreement, which provided Rdio uninterrupted access to SME's library of digital content and enabled Rdio to deliver millions of additional streams to its customers, even though Rdio had not paid the Minimum Revenue Guarantee that it owed SME." Rider ¶ 5.c. | "While those negotiations were ongoing, SME entered into a series of interim extensions of the Content Agreement. These extensions provided Rdio continued access to SME's sound recordings, and also allowed Rdio to avoid paying $5.5 million that originally was due to SME by December 31, 2014." NY Complaint ¶ 9. |
| "On September 30, 2015, SME and Rdio executed the 2015 Renewal Amendment." Rider ¶ 5.d. | "Bay ultimately signed the amendment to the Content Agreement on Rdio's behalf on September 30, 2015 (the 'Renewal Amendment')." NY Complaint ¶ 13. |
| "Upon information and belief, and unbeknownst to SME, at the same time that Rdio was negotiating the 2015 Renewal Agreement with SME, Rdio was also negotiating with Pandora, which expressed an interest in June 2015 or earlier in purchasing Rdio's assets through a bankruptcy sale." Rider ¶ 5.e. | "Unbeknownst to SME, however, at the same time that Rdio was negotiating the amendment to its Content Agreement with SME, it was simultaneously negotiating its deal with Pandora – under which Rdio would file for bankruptcy[.]" NY Complaint ¶ 10. |

| Sony Bankruptcy Claim Allegations | New York Action Allegations |
|---|---|
| "Rdio's planned bankruptcy would have been a material consideration for SME in deciding whether to continue extending the Content Agreement or enforce its contractual rights. Indeed, Rdio fraudulently concealed this fact from SME precisely because it knew that disclosure of the truth could result in termination of Rdio's access to SME's catalog, which would have damaged the value of Rdio and jeopardized a deal with Pandora." Rider ¶ 5.f. | "Defendants knew that Rdio's planned bankruptcy would have been a material consideration for SME in deciding whether to enter into the Renewal Amendment and then extend its payment terms, or to withdraw its content from Rdio and insist upon payment of the millions of dollars Rdio already owed. But preserving Rdio's access to SME's content was critical to the continued viability of Rdio's business and, by extension, to the completion of the Pandora deal." NY Complaint ¶ 41. |
| "Also unbeknownst to SME at the time, by the time the parties executed the 2015 Renewal Amendment on September 30, 2015, Pandora and Rdio had already executed a letter of intent formalizing the plan for Pandora's acquisition of Rdio's assets through the bankruptcy sale. . . . Even at the time Rdio entered into the 2015 Renewal Amendment, it knew that it did not intend to perform." Rider ¶ 5.g. | "Unbeknownst to SME at the time, Rdio had one day earlier signed a Letter of Intent with Pandora concerning the intended bankruptcy filing, which would prevent Rdio's performance of its obligations to SME under the Renewal Amendment. Rdio never intended to fulfill the commitments it made in the Renewal Amendment." NY Complaint ¶ 14. |
| "On September 30, 2015 – immediately following execution of the 2015 Renewal Amendment – Rdio requested a one-month extension of the prepayment deadline. Rdio falsely represented to SME that it was on the verge of signing new agreements to raise capital out of which the $2 million would be paid, and that it likely would be able to pay the $2 million prepayment by October 28, 2015, and in any event no later than November 1, 2015." Rider ¶ 5.i. | "On September 30, 2015, immediately after Bay's execution of the Renewal Amendment, Rondinelli contacted SME's Senior Vice President Andre Stapleton in New York. In that conversation, Rondinelli requested a one-month extension of the $2 million prepayment deadline from October 1, 2015 to November 1, 2015. To induce Stapleton to agree to the extension, Rondinelli represented that Rdio was on the verge of signing new agreements to raise capital out of which the $2 million would be paid. Rondinelli represented to Stapleton that Rdio would be able to pay the $2 million prepayment by October 28, 2015, but in any event would do so no later than November 1, 2015." NY Complaint ¶ 46. |

| Sony Bankruptcy Claim Allegations | New York Action Allegations |
|---|---|
| "SME did not learn about Rdio's planned bankruptcy until Rdio filed for Chapter 11 relief on November 16, 2015." Rider ¶ 5.j. | "On November 16, 2015, Rdio filed for Chapter 11 relief in the United States Bankruptcy Court for the Northern District of California. Only then did SME learn for the first time that Rdio had been planning for months to file for bankruptcy[.]" NY Complaint ¶ 38. |
| "SME was damaged as the result of its reasonable reliance on Rdio's knowing and material misrepresentations and omissions. Rdio never paid SME the $5.5 million Minimum Revenue Guarantee, nor did it pay the $2 million prepayment under the 2015 Renewal Agreement, nor did it pay anything at all to SME for use of SME's content in August, September, or October 2015, even though its users continued to stream recordings owned by SME." Rider ¶ 5.k. | "SME was damaged as the result of its reasonable reliance on Rdio's knowing and material representations and omissions. Rdio never paid SME the $5.5 million Minimum Revenue Guarantee, nor did it pay the $2 million prepayment under the Renewal Amendment, nor did it pay SME the amounts it owed for use of SME's content in August, September, and October of 2015, even though Rdio's users continued to stream recordings owned by SME." NY Complaint ¶ 54. |
| "Rdio was unjustly enriched at SME's expense for the reasons described in paragraphs 5(a)-(l) [of the Rider]. It would be against equity and good conscience to permit Rdio to retain the benefits described above." Rider ¶ 5.m. | "Each of the Defendants was enriched by the fraud at SME's expense. . . . It would be against equity and good conscience to permit Defendants to retain any benefits that they obtained as a result of their fraudulent conduct." NY Complaint ¶¶62-63. |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document: **PLAINTIFF RDIO, INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION PURSUANT TO 11 U.S.C. §§ 105 AND 362, RULE 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AND RULES 7001(7) AND 7065 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 9, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender**     rb@lnbyb.com
- **Philip A. Gasteier**     pag@lnbrb.com
- **Irvin M. Gross**     img@lnbyb.com
- **Krikor J. Meshefejian**     kjm@lnbyb.com

**2. SERVED BY UNITED STATES MAIL**: On **May 9, 2016**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Sony Music Entertainment
c/o Susan Meisel, Esq.
25 Madison Ave.
New York, NY 10010

☐ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 9, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail***
The Hon. Dennis Montali
U.S Bankruptcy Court
450 Golden Gate Avenue, 16th Floor
Courtroom 17
San Francisco, CA 94102

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 9, 2016 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1 PROOF SERVICE**